[No. A122932. First Dist., Div. Five. Aug. 23, 2010.]

TED JACOB ENGINEERING GROUP, INC., Plaintiff and Appellant, v. THE RATCLIFF ARCHITECTS, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.A.2.b.–e. and III.B.

946

## Counsel

Bell, Rosenberg & Hughes, Roland Nikles, Anthony L. Critchlow; Jenkins Goodman Neuman & Hamilton and Michael L. Marx for Plaintiff and Appellant.

Bien & Summers, Elliot L. Bien and Amy E. Margolin for Defendant and Appellant.

## Opinion

**BRUINIERS, J.**—The Ratcliff Architects (Ratcliff) provided design services under contract with the County of San Mateo (the County) for a hospital renovation and expansion project. Ratcliff subcontracted with Ted Jacob Engineering Group, Inc. (TJEG), for mechanical and electrical engineering services. The scope of the project increased over time. TJEG submitted claims for additional fees based on the increased basic scope of work and for additional services it alleged it was directed to perform by Ratcliff. Ratcliff paid some, but not all, of TJEG's claims. TJEG sued Ratcliff and prevailed in a jury trial. The trial court awarded prejudgment interest on TJEG's recovery and awarded TJEG its attorney fees and costs. Ratcliff argues the judgment must be reversed because the instructions to the jury were contradictory and confusing, and because TJEG's claims were not sufficiently certain to support an award of prejudgment interest. We affirm.

In the published portion of this opinion we hold that, in the absence of a negotiated agreement upon price, and assuming no contrary contractual provision applies, a subcontractor may still pursue a claim seeking a judicial determination of additional fees when it performs work demanded of it by the general contractor constituting a material change in the scope of work defined under the contract. If good faith negotiation between the parties fails to result in agreement on price, the subcontractor is not required to elect between abandoning the job and forfeiting its right of recovery if it elects to perform the required work.

## I. TRIAL EVIDENCE[1]

*The Project*

In about 1992, the County commissioned Kaplan/McLaughlin/Diaz (KMD) to study a potential renovation and expansion of the San Mateo County General Hospital (the Project). The KMD study, which was completed in May 1992, included a design with an estimated construction cost of $45,808,424 without cost escalation or a 10 percent contingency (concept A-8). The KMD study concluded that the central plant of the hospital would have to be replaced.

The County then directly commissioned TJEG to further study the central plant issue. TJEG's study (the Central Plant Study), completed in July 1992, concluded that the cost of the central plant replacement would be much higher than had been originally estimated by KMD.

The County began hiring a design team for the Project. Consistent with custom and practice in the industry, the County intended to contract directly with an architectural firm, which would in turn contract with consultants to assist in the design of the Project. The architectural firm and its consultants collectively would comprise the design team. Ratcliff asked TJEG for a proposal for the mechanical (including HVAC [heating, ventilating, air conditioning] and plumbing) and electrical design work on the Project.

Notwithstanding the conclusion of TJEG's Central Plant Study, Ratcliff told TJEG to base its fee proposal on concept A-8 from the KMD study and TJEG did so. At an August 17, 1992 meeting with Ratcliff and the County, TJEG principal Ted Jacob asked how TJEG's fees would be adjusted if the Project scope exceeded what was anticipated in the KMD study. He received "strict instructions to base [his] fee on the KMD scheme A-8 on the hospital and the central plant, and . . . [was told that] at the end of the design development they [would] make the adjustment" based on estimated construction costs at that time. Jacob memorialized this understanding as to the scope of work included in TJEG's proposal in an August 17, 1992 letter to Ratcliff.

---

[1] As we discuss *post*, there was a previous trial of this action. In an earlier appeal, we reversed a grant of judgment on the pleadings in favor of Ratcliff on TJEG's breach of contract and quantum meruit claims, and affirmed a jury verdict in favor of TJEG on Ratcliff's cross-complaint. (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (Nov. 15, 2006, A105617) [nonpub. opn.] (*TJEG I*).) In a related appeal, we reversed posttrial orders awarding Ratcliff fees and costs, and denying TJEG's motion for fees and costs, in light of the *TJEG I* decision. (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (Nov. 15, 2006, A108440/A108639) [nonpub. opn.].)

Based on concept A-8, Jacob proposed a fee of $1,072,270 for mechanical and electrical design work. Its fee proposal stated: "The following items are not outlined in the KMD Master Plan but must be performed as recommended in the Central Plant Study and per our meeting with Fred Countryman. It is agreed that the additional fees will be allocated to us after design development." A list of additional tasks and fees followed. Shortly thereafter, Ratcliff directed TJEG to commence work on the Project.

Stephanie Bartos, Ratcliff's manager on the Project until January 1995, testified that she believed "there was a discrepancy between the work defined in the KMD study and what actually had to be done . . . to complete the work according to code and good design practice."[2] (Original ellipsis.) She testified that the County's representative on the Project, Fred Countryman, had insisted that Ratcliff base its fee on concept A-8 and promised that the fee would change if the scope of work changed.

*Ratcliff/County Contract*

On August 25, 1992, Ratcliff and the County executed an Agreement for Architectural Services (Ratcliff/County Contract). The contract defined the Project scope to be "as described in the Facility Program and Conceptual Design Report, Volumes 1 and 2, prepared by Kaplan/McLaughlin/Diaz, dated May 1992, *and the Central Plant Feasibility Study prepared by Ted Jacob Engineering Group, Inc., dated July 1992*, with any subsequent revisions agreed upon by Owner and Architect." (Italics added.) A fixed fee of $4,076,949 covered Ratcliff's performance of "Basic Services" on the Project, which included programming verification, schematic design, design development, preparation of construction documents, and construction contract administration. (Par. 5.01.) From this fee, Ratcliff was responsible for payment of its subcontracting consultants. (Par. 5.06.)

Paragraph 5.05 of the Ratcliff/County Contract provided, "Substantial changes in the Project's scope shall provide sufficient basis for renegotiation of [Ratcliff's] fee." Ratcliff was also entitled to additional compensation if it performed services that were not encompassed in Basic Services. (Extra Services; par. 5.03.) Paragraph 5.03 of the contract provided that: "Extra Services shall not be rendered by [Ratcliff] under this Agreement unless they are first authorized in writing by [the County]. The Payment to [Ratcliff] for Extra Services shall be at the [hourly] rates set forth" in an exhibit to the contract.

---

[2] Bartos's deposition testimony was read to the jury.

*Ratcliff/TJEG Contract*

Although Ratcliff directed TJEG to start work on the Project in August 1992, Ratcliff and TJEG did not sign a written contract until August 1993. In February 1993, Ratcliff sent TJEG a draft contract, which incorporated by reference the Ratcliff/County Contract and required TJEG to perform services in accordance with that contract. TJEG had by that time received an executed copy of the Ratcliff/County Contract. TJEG's fee for Basic Services in the draft Ratcliff/TJEG contract was set at $1,212,800.

By February 1993, the defined scope of the Project had already changed, as described in greater detail *post.* TJEG refused to sign the February 1993 contract as drafted without clarification that its fee was based on the KMD study scope of work alone. A revised version of the draft contract prepared in March 1993 changed the fee to $1,197,270, but it also was not signed. In May 1993, Ratcliff published a design development report that reflected the changed scope of the Project and included new construction cost estimates.

In a July 26, 1993 letter to Ratcliff, TJEG wrote that its fee was based on the KMD study and did "not reflect any increases to the building areas and estimated construction costs which have occurred during the design develop-ment process." TJEG requested $304,690 in additional fees based on this increased scope of work. In an August 12, 1993 letter to Ratcliff, TJEG again requested the $304,690 fee increase for services "which are required due to building area and construction cost increases which have occurred to date." The August 12, 1993 letter stated, "The fees listed in the Architect/Consultant Agreement (Part III, Compensation) dated March 25, 1993 were based upon construction costs extracted from the KMD May 1992 Report. These fees do not reflect any increases to the building areas and estimated construction costs which have occurred during the design development."

On August 13, 1993, TJEG principal Ted Jacob signed the March 1993 revised Ratcliff/TJEG contract, but with a modification. At part III, compen-sation (which provided for a fee of $1,197,270 for Basic Services), he added the notation, "Revised as noted in Ted Jacob Eng. letter dated August 11, 1993" and he attached to the contract the referenced letter and its enclosures (which included TJEG's Aug. 13 and 17, 1992 letters). The contract also provided in part IV for payment for "Additional Services" at specified hourly billing rates, with "prior written authorization" from Ratcliff. Ratcliff signed this modified version of the contract (Ratcliff/TJEG Contract).

Thus, the seeds of this litigation were sown when Ratcliff and TJEG signed a contract which both parties explicitly understood was based on a defined scope of work *excluding* the Central Plant Study, although Ratcliff had earlier

contracted with the County for a defined scope of Basic Services explicitly *including* that study. Ratcliff, however, did not appear to be fully cognizant of this discrepancy until much later. Stephanie Bartos agreed in her testimony that the $1,197,270 fee in the August 1993 Ratcliff/TJEG Contract was based on work under the KMD master plan, but believed that the August 1992 Ratcliff/County Contract was as well. She did not believe the fees in the August 1993 Ratcliff/TJEG Contract would be sufficient to compensate TJEG for the mechanical and engineering work on the Project that was actually underway in August 1993.

*Change in Project Scope During Schematic Design and Design Development*

As noted, the Project scope, even as defined in the Ratcliff/County Contract, had changed between August 1992 and August 1993. In the schematic design phase, which culminated in a December 1992 report, the footprint of the Project changed and the estimated square footage and construction costs increased. Ted Jacob testified that the mechanical and electrical engineering work involved in modifying the site utilities for the new layout required was a "[m]onumental task." TJEG discussed the issue with Ratcliff in a series of meetings and asked for increased fees for these services.

Bartos knew in the fall of 1992 that the scope of the Project would increase and that the increase would cause Ratcliff and TJEG to incur additional costs. However, Countryman had told her that any increase in the construction budget would be a political problem because the County Board of Supervisors had to vote to continue the Project. She decided to wait until after the board approved the Project in December 1992 before requesting additional fees. Ratcliff's cost consultant initially estimated the cost of the Project as modified in the December 1992 schematic design at $60 million, but the cost consultant later reduced that figure in order to keep it within budget. The cost consultant achieved the reduction in price in part by reducing the contingency cushion from 10 percent to 5 percent and by decreasing projected cost escalations from 7 percent to 5 percent.

Countryman testified that Ratcliff told the County at the end of the schematic design phase that the estimated costs for the Project had *not* increased, and that Ratcliff "assured the County that both the construction costs and their fees were adequate."[3] He said that he had specifically asked Bartos if there was any change in Ratcliff's design fee and she confirmed that there was not. Ratcliff told the board of supervisors at the December 1992 meeting that the Project was still within budget and that the board approved

---

[3] Countryman's deposition testimony was read to the jury.

the Project with that assurance. The County later denied certain of Ratcliff's requests for additional fees on the basis that they should have been presented at that time. An expert witness for TJEG, David Zion, opined that Ratcliff misrepresented the cost of the Project to the board of supervisors in violation of its professional standard of care.

In a May 1993 design development report, estimated construction cost was $18,888,000 for the inpatient wing (compared to $14,634,120 in the KMD study's concept A-8); $14,619,000 for the clinic (compared to $12,848,700 in concept A-8); and $9,812,000 for the central plant (compared to $5,474,150 in concept A-8). The total construction cost was $53,905,000 before escalation, compared to $45,808,424 before escalation in the KMD concept A-8.

In the summer of 1993, the Project scope expanded further when the County adopted a long-range plan adding a diagnostic and treatment building to the hospital.

*Requests for Additional Basic Services Fees Based on Increased Scope of Work*

As noted, in letters dated July 26 and August 12, 1993 (and again in an Aug. 27, 1993 letter), TJEG requested $304,690 for additional Basic Services fees based on the increase scope of the Project reflected in the May 1993 design development report. In the meantime, TJEG was in "constant communication" with Bartos on the issue. In an August 29, 1993 memorandum memorializing a meeting between TJEG and Ratcliff, Jacob wrote, "The additional design fee of $304,690.00 will be presented by The Ratcliff Architects to the County." At Ratcliff's request, TJEG later revised its additional fee request to $256,205 based on lowered construction cost estimates following the design development report.[4]

Bartos testified that she "agreed to . . . incorporate this material into ongoing fee requests to the County for additional fees," and did so both orally and in writing. She testified that she would not have sent TJEG's request on to the County unless she thought TJEG was entitled to the additional fees. "However, . . . I would only think they were entitled to receive them from us if we got them from the County."[5]

In May 1994, Ratcliff submitted TJEG's additional fee request to the County. In approximately the summer of 1994, TJEG and Ratcliff met with

[4] TJEG also requested additional fees for increased work required by adoption of the long-range plan. TJEG performed, and was paid for, all of this work.

[5] In our opinion in the prior appeal, we noted that the Ratcliff/TJEG Contract included a provision that "receipt by [Ratcliff] of funds from [the County] for work performed by [TJEG] is a condition precedent to [Ratcliff's] obligation to pay for work performed by [TJEG]."

the County about the fee request and Countryman agreed to prepare a contract amendment to pay the request if Ratcliff provided a detailed letter supporting the request. Between May 1994 and March 1995, Countryman waited for Ratcliff to submit such a letter, but Ratcliff never did so. When Countryman asked Bartos about the letter, she said she had not sent it because Ratcliff wanted to request additional funds and she wanted to submit the requests together. TJEG was never paid these additional fees.

In November 1994, Ratcliff and the County executed a contract amendment (Ratcliff/County Amendment No. 2) increasing the estimated construction cost of the Project based on the changes caused by the adoption of the long-range plan adding the diagnostic and treatment building and also increasing Ratcliff's fee. TJEG's expert Zion opined that Ratcliff violated the standard of care and ethical duties of an architect when, while negotiating additional Basic Services fees for the long-range plan, it did not include TJEG's request for about $300,000 in fees based on changes to the scope of the Project before adoption of the long-range plan. He opined that Ratcliff did not timely submit TJEG's request for additional fees to the County.

In May 1995, Ratcliff compiled all of the outstanding additional fee requests for the design team into a binder that came to be known as the "Red Book." Fred Jacob of TJEG testified that he met with David Thurston of Ratcliff as part of this compilation process, that he discussed the correct valuation of TJEG's fee adjustment resulting from the change in the original master plan, and that he came to an agreement with Thurston that $395,630 was an appropriate fee adjustment for TJEG for the Basic Services and was a fair and reasonable valuation of TJEG's additional work. TJEG performed all of the work covered by this fee request. In the Red Book, Ratcliff asked for this $395,630 fee adjustment as part of an overall fee adjustment of $865,001 for basic contract scope change for the whole design team.[6] Kit Ratcliff denied that Ratcliff had agreed $395,630 was a fair and reasonable evaluation of TJEG's work or that TJEG was entitled to be paid that amount, and said Ratcliff was merely "moving their proposals forward." Thurston did not testify.

In August 1995, Ratcliff sent TJEG an amendment to the Ratcliff/TJEG Contract (Ratcliff/TJEG Amendment No. 2), which increased TJEG's fee to

---

(*TJEG I, supra*, A105617.) We also noted that Ratcliff had conceded the provision was an unenforceable "pay-when-paid" provision that is void as against public policy. (*Ibid.*) The provision was deleted from the copy of the Ratcliff/TJEG Contract that was provided to the jury at the trial under review here.

[6] The Red Book request for additional compensation also included a request for $619,868 for completed work on additional scope changes, and proposed two alternatives for compensation for additional construction administration effort. Both of these requests included additional compensation for TJEG. Those claims are discussed *post*.

cover increased work caused by adoption of the long-range plan. TJEG did not sign the amendment because it did not include all of its outstanding fee requests based on the increased scope of the Project. TJEG was paid the additional fee provided in the amendment, but that fee did not cover any part of the amounts that TJEG sought to recover in the litigation.

On December 31, 1995, TJEG sent Ratcliff a series of invoices for its outstanding claims for additional fees on the Project. One of these invoices was for "Basic Contract Scope Change" in the amount requested in the Red Book of $395,630.

In about February 1996, the County argued in a letter to Ratcliff that the design team's fee requests in the Red Book based on increases in the basic scope of work lacked merit because the work was already encompassed in the definition of Basic Services in the Ratcliff/County Contract. Kit Ratcliff "went back and reread [Ratcliff's] agreement with the County. And in looking at the scope of work that was required of [Ratcliff] in the agreement and looking at his words, it was pretty sobering, because I felt like he had made some very strong points in his statements." He concluded Ratcliff would not prevail if it pursued its claim against the County based on an increase in the originally defined scope of the Project. He also concluded that TJEG's $395,630 claim lacked merit because the work was encompassed within the definition of Basic Services in the Ratcliff/County Contract. Ratcliff nevertheless continued to seek additional fees to see if the County would grant them. In an August 21, 1996 letter, Ratcliff disputed the position taken by the County in its February 1996 letter and requested mediation of the fee issues.

In August 1997, Ratcliff again compiled all outstanding additional fee requests for the design team in a binder that came to be known as the "Purple Book." The Purple Book again requested a $395,630 fee adjustment for TJEG for basic contract scope changes (as part of the overall request for $865,001 for the entire design team), although Ratcliff omitted certain other claims because Kit Ratcliff felt they would be difficult to win.

Failing to reach agreement on the fee disputes, in about March 1998, Ratcliff gave notices terminating its contract with the County and its contract with TJEG. Ratcliff and the County executed a written termination agreement, effective May 13, 1998, which acknowledged satisfaction of all fee claims, with the exception of those set forth in the Purple Book, which Ratcliff continued to pursue.[7]

---

[7] Ratcliff filed a cross-complaint against the County in this action. All claims between Ratcliff and the County were settled in 2003 in a confidential mediation.

*Construction Contract Administration Costs*

In lieu of hiring a general contractor, the County hired a construction manager who worked with multiple prime contractors. As a result, the design team's construction contract administration costs were much higher than usual. TJEG incurred additional construction contract administration costs of about $16,000 a month for the entire period of construction.

In the May 1995 Red Book, Ratcliff requested $1,732,210 in additional compensation for itself and $57,954 for TJEG for the increased construction administration work resulting from the lack of a general contractor. Ratcliff did not discuss this request with TJEG before submitting the Red Book to the County.

In an August 31, 1995 letter to Ratcliff, TJEG requested $234,067 in additional compensation for construction administration from June 1994 through August 1995, and projected $96,536 in additional construction administration fees for September 1995 to February 1996, for a total of $330,603. Fred Jacob discussed this letter with Thurston, who agreed on TJEG's methodology for calculating the additional fee request. Ratcliff directed TJEG to perform all of the additional construction administration work and TJEG performed the work. On December 31, 1995, TJEG invoiced Ratcliff $330,603 for unpaid contract administration services.

In June 1996, Ratcliff and the County executed a contract amendment (Ratcliff/County Amendment No. 3) that increased Ratcliff's Basic Services fee by $400,000 for contract administration plus a separate $50,000 Extra Services allowance intended for TJEG. The amendment also stated, "Approval of this Amendment settles any and all claims by [Ratcliff] which have been previously submitted regarding the Contract Administration of Phases I through III." The County's representative, Countryman, testified that as part of an amendment to the Ratcliff/County Contract the County had approved about $200,000 for TJEG's services, which he assumed was part of the $400,000 figure in Ratcliff/County Amendment No. 3. TJEG's expert Zion opined that Ratcliff violated its duty of care to TJEG when it negotiated additional construction contract administration fees from the County for itself, waiving further claims, but failed to request adequate fees to cover TJEG's additional construction administration costs.

In August 1996, Ratcliff and TJEG executed an amendment to the Ratcliff/TJEG Contract (Ratcliff/TJEG Amendment No. 3), which provided $50,000 in additional compensation to cover the expense of a TJEG employee's attendance at a weekly meeting with contractors through October 1997. This $50,000 in compensation was in addition to the $16,000 a month in

additional costs encompassed in TJEG's already outstanding fee request. TJEG did not intend to waive its claim for those fees by signing Amendment No. 3.

In the August 1997 Purple Book, Ratcliff omitted its own construction contract administration fee requests because Kit Ratcliff concluded the $400,000 it had received under Ratcliff/County Amendment No. 3 "was the best deal we were going to get." The Purple Book, however, did include TJEG's construction administration claims for $244,184 for June 1994 to December 1996; $145,083 for January to June 30, 1997, and $88,640[8] in projected costs for July to December 1997 for a total of $477,907.

In December 1997, Ratcliff and the County executed another contract amendment (Ratcliff/County Amendment No. 4) that extended the construction administration services authorized in Ratcliff/County Amendment No. 3 for three months and increased Ratcliff's compensation by another $111,666. Ratcliff/County Amendment No. 4 again stated, "Approval of this Amendment constitutes full and final settlement of any and all claims for the provision of services under [the provisions regarding the construction contract administration phase] as contained in the [Ratcliff/County Contract] and the [Ratcliff/County Amendment No. 3]." Also in December 1997, Ratcliff and TJEG executed a contract amendment (Ratcliff/TJEG Amendment No. 5) that increased TJEG's fee by $21,000 for contract administration fees from November 1997 through January 1998.

Before trial, TJEG tallied all of the hours it spent on contract administration on the Project from June 1994 through March 1998. The total with escalation was $848,285. TJEG had been paid $265,995 that had been budgeted for construction contract administration in the original contract, $50,000 under Ratcliff/TJEG Amendment No. 3, and $21,000 under Ratcliff/TJEG Amendment No. 5. It sought an award of the remaining balance of $511,290.

*Additional/Extra Services*

David Sasai, TJEG's Project coordinator, testified that Ratcliff directed TJEG to perform several Additional Services as defined in the Ratcliff/TJEG

---

[8] A summary table of the design team's requests for additional compensation in the Purple Book identifies TJEG's contract administration costs for this period as $86,640 rather than $88,640. However, Ratcliff's executive summary in the Purple Book identifies the sum as $88,640 and supporting documentation for the claim in the Purple Book (including a tally of individual TJEG employees' projected labor hours and costs) identify the figure as $88,640. When considered in its entirety, the trial court could reasonably find that the Purple Book asserted an $88,640 claim and the lower amount in the summary table was a typographical error.

Contract during the Project. Sasai's practice on receiving such a request from Ratcliff was to document the request, price it in consultation with the various disciplines within TJEG, review the price estimate with Ted or Fred Jacob, and then submit the price documentation to Ratcliff. Ratcliff would direct TJEG to perform Additional Services either orally, by change order, or by providing documents that showed changes. Ratcliff never told Sasai that TJEG needed written authorization before performing the requested Additional Services or that it would not be paid in the absence of prior written authorization. Ted Jacob testified similarly. When Ratcliff directed TJEG to proceed with Additional Services without providing written authorization, TJEG documented the scope of work and a fee proposal for the request and presented it to Ratcliff for signature and approval. Ratcliff never told TJEG not to proceed with this work.

Among Additional Services claims included in the May 1995 Red Book, 17 of these claims were pursued by TJEG at trial. While Ratcliff was preparing the Red Book, Sasai met with Thurston at Ratcliff to discuss these Additional Services requests. Sasai and Thurston discussed the additional work performed by TJEG, and Sasai testified that Thurston agreed that the requested fees represented the fair value of the work. Thurston did not contend that TJEG would not be paid because it had not received prior written authorization for the work. Sasai's testimony was that Ratcliff had directed TJEG to perform all of this work; that TJEG had performed the work; that Ratcliff had never told TJEG to stop performing the work; and that Ratcliff never said TJEG would not be paid because it had not received prior written authorization.

The Red Book identified the 17 Additional Services items as (1) increase in the number of bid packages ($44,880), (2) value engineering ($38,250), (3) additional phasing drawings ($32,640), (4) increase in site lighting ($12,500), (5) change in airflow and infection control for clinic building ($10,410), (6) relocation of dishwasher ($7,370), (7) equipment changes in the hospital ($16,000), (8) implementation of measures necessary to obtain utility rebates ($6,935), (9) uninterruptable power supply for main computer room ($11,745), (10) relocation of an emergency generator ($1,890), (11) coordination of telecommunication data systems ($6,685), (12) implementation of state energy commission recommendations ($12,265), (13) addition of emergency power to the clinic building ($11,380), (14) presentation about intercom safety and nurse call systems ($5,800), (15) change in lighting for computer room ($1,200), (16) revision of telephone systems ($3,200), and (17) design of fiber optic charting technology ($2,800). All of these Additional Services were also identified in TJEG's December 31, 1995 invoices to Ratcliff. These 17 fee requests totaled $225,950.

In May 1997 letters to Ratcliff, TJEG requested $10,850 for Additional Services performed to address a problem with the seismic bracing of above-ground piping from the central plant; $16,940 in fees for Additional Services performed to address a problem with the generators; and $36,460 in fees for Additional Services performed to address a problem with the installation of equipment and piping in the central plant. TJEG and Ratcliff agreed on this scope of work and that the requested amounts represented the fair and reasonable value of the work. Ratcliff never objected to the May 1997 letters. TJEG also incurred $55,890 in reimbursable costs above what had been budgeted as part of its fee.

The August 1997 Purple Book prepared by Ratcliff included all 17 Additional Services claims that had been included in the Red Book, the three Additional Services requests reflected in the May 1997 letters, as well as the $55,890 request for reimbursables, for a total of $346,030.[9]

*Contract Termination*

As noted above, Ratcliff terminated its contract with the County in March 1998, because of the ongoing disputes about the fee claims books and because of the stress of the construction contract administration work. The termination agreement was signed in May 1998.

On or about March 15, 1998, TJEG sent a series of "final invoices" to Ratcliff for TJEG's work on the Project to date based on fees that had been approved in the original contract or by contract amendment. The invoices credited fees that had been previously billed for work that was never performed because of the early termination. By submitting the invoices, TJEG asserted that it did not intend to waive its right to be paid for construction administration, the change in the Basic Services scope of work from the KMD study, or Additional Services it had performed and it continued to pursue those claims. Ratcliff never indicated in 1998 or 1999 that by submitting these invoices TJEG had settled and disposed of all of its claims. Ratcliff later paid TJEG for other items not included in these invoices and not expressly authorized in the Ratcliff/TJEG Contract or its amendments.

---

[9] The sum of the 17 Additional Services claims ($225,950), the three requests made in May 1997 ($10,850 plus $16,940 plus $36,460, equaling $64,250), and the $55,890 request for reimbursables is $346,090. The total in the Purple Book is $60 less than this figure because in the Purple Book Ratcliff claimed only $36,400 for Additional Services performed to address a problem with the installation of equipment and piping in the central plant. In the Purple Book, the May 1997 requests and the $55,890 request for reimbursables total $120,080.

## II. Procedural History

TJEG filed this lawsuit against Ratcliff in January 1999. The trial court granted Ratcliff's motion for judgment on the pleadings.[10] A jury found in favor of TJEG on Ratcliff's cross-complaint. In *TJEG I*, we affirmed the judgment on Ratcliff's cross-complaint but reversed the judgment on TJEG's complaint. We concluded that "ambiguities exist as to material terms of the contract so as to render the judgment on the pleadings erroneous. [¶] . . . [¶] . . . Contrary to Ratcliff's argument, the [contract] amendments do not conclusively establish that they resolved all outstanding claims by TJEG. . . . [T]he amendments do not on their face establish that TJEG was not entitled to further compensation for 'additional services' or other basic services beyond the original scope of the basic services provided for in the Ratcliff/TJEG contract. [¶] Moreover, as TJEG asserts, the amendments to the Ratcliff/TJEG contract do not state that they resolve all pending claims for payment by TJEG." (*TJEG I, supra*, A105617.) Further, " 'Additional services' is not defined and such additional services are not enumerated in either the Ratcliff/TJEG contract or the Ratcliff/County contract. . . . [T]he Ratcliff/TJEG contract is ambiguous as to whether such additional services by TJEG must be authorized by both the County and Ratcliff or solely by Ratcliff. . . . In addition, assuming County approval was required, the Ratcliff/TJEG contract is ambiguous as to which party was obligated to obtain that authorization. . . . Of course, if TJEG's contractual interpretation is correct, TJEG would be entitled to rely on the assumption that before Ratliff directed it to perform some additional service, Ratliff had obtained the County's approval." (*Ibid.*, fn. omitted.)

After remand, TJEG filed a second amended complaint asserting causes of action for breach of contract, breach of implied contract, breach of the covenant of good faith and fair dealing, and quantum meruit. The contract causes of action went to trial before a jury, with the trial court interpreting the contract and instructing the jury on its application. In closing argument, TJEG asked the jury to award it $312,548 for work caused by the increased basic scope of work on the Project (the $395,630 claim in the Red and Purple Books minus $83,082 [21 percent] for work that was also included in TJEG's construction administration claim); $511,290 for unpaid construction contract administration work; and $346,090[11] for uncompensated Additional Services work it performed. The total amount of TJEG's claim was $1,169,928. The jury returned a general verdict in TJEG's favor for $1,080,698.

After trial, TJEG moved to dismiss its quantum meruit cause of action without prejudice. The trial court dismissed the claim with prejudice. TJEG

---

[10] This early procedural history is recited in our opinion *TJEG I, supra*, A105617.

[11] See footnote 9, *ante*.

also moved for an award of prejudgment interest. Over Ratcliff's opposition, the trial court granted the motion and awarded $1,278,675 in prejudgment interest pursuant to Civil Code section 3287, subdivision (a), and an alternative discretionary award of $1,017,657 in prejudgment interest pursuant to Civil Code section 3287, subdivision (b). The court entered judgment in the amount of $2,359,373 (the jury's award of $1,080,698 plus prejudgment interest of $1,278,675).

Ratcliff filed a motion for judgment notwithstanding the verdict and a motion for a new trial relying in part on alleged errors in the jury instructions. The court denied both motions.

TJEG moved for an award of attorney fees under the parties' contract and pursuant to statute. The court granted the motion and awarded $2,253,411.97 in attorney fees.

Ratcliff appeals from the judgment, from the order denying its motion for judgment notwithstanding the verdict, and from the award of attorney fees. TJEG has filed a "protective cross-appeal" from the order dismissing its quantum meruit claim with prejudice.

### III. DISCUSSION

Ratcliff challenges the judgment on the grounds that the jury instructions were argumentative, contradictory and confusing. It further contends that the award of prejudgment interest was unauthorized because TJEG's claims were neither certain nor capable of being made certain by calculation. We reject both arguments and affirm the judgment.[12]

### A. *Jury Instructions*

Ratcliff argues the trial court erred in providing the jury with argumentative and contradictory instructions. It contends that the instructions precluded fair consideration of Ratcliff's primary defense that the only valid and enforceable contract between Ratcliff and TJEG was exclusively incorporated in the agreement signed by both parties on August 13, 1993, and in its five written amendments.

The major flaw in this argument is that the issue of contract interpretation was never submitted to the jury. The court ruled that it would provisionally

---

[12] Ratcliff challenges the award of attorney fees and costs solely on the ground that it must be reversed if the judgment or prejudgment interest award is reversed. Because we affirm the judgment and award of prejudgment interest, we affirm the award of fees and costs as well. We dismiss TJEG's protective cross-appeal as moot. We also deny Ratcliff's January 26, 2010 motion to strike new contentions in cross-appellant's reply brief as moot.

admit evidence to support the parties' conflicting interpretations of the contracts, and would submit special interrogatories to the jury if it became necessary for it to resolve such issues. The trial court ultimately found no conflicting extrinsic evidence requiring jury resolution, interpreted the contract as a matter of law on the basis of the evidence, and instructed the jury accordingly. The court concluded the contract was not integrated, that it consisted of writings in addition to those identified by Ratcliff, and that it did not require TJEG to confirm the County's approval of additional work before it performed that work. Because these issues were settled as far as the jury was concerned, the alleged instructional errors could not have misled the jury into rejecting contrary theories. In any event, Ratcliff fails to make any showing of a reasonable probability that any errors in the instructions affected the jury's verdict.

### 1. *Standard of Review*

"The propriety of jury instructions is a question of law that we review de novo. [Citation.]" (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82 [89 Cal.Rptr.3d 34].) In *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548 [34 Cal.Rptr.2d 607, 882 P.2d 298] (*Soule*), the California Supreme Court definitively held, "[T]here is no rule of automatic reversal or 'inherent' prejudice applicable to any category of civil instructional error, whether of commission or omission. A judgment may not be reversed for instructional error in a civil case 'unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) . . . [¶] Instructional error in a civil case is prejudicial 'where it seems probable' that the error 'prejudicially affected the verdict.' [Citations.]" (*Soule*, at p. 580.)

Ratcliff argues that a more lenient standard for reversal applies when jury instructions are internally inconsistent or contradictory as opposed to flatly erroneous. Citing *Henderson v. Harnischfeger Corp.*, Ratcliff argues reversal is required on a showing that contradictory instructions *possibly* affected the verdict. (*Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 671 [117 Cal.Rptr. 1, 527 P.2d 353] (*Henderson*).) In *Soule*, however, the Supreme Court clearly held that its "adoption of [the aforementioned] uniform test for civil instructional error disposes of [the] contention that we must find the erroneous [instruction in this case] prejudicial because it raises a mere *possibility* that the jury's verdict was based on an incorrect legal theory. (See, e.g., [citation]; *Henderson*[, at pp.] 671–674 . . . ; [citation].) The oft-repeated maxim that an appellate court may not 'speculate' on the instructional basis of a general verdict cannot mean that a civil judgment must invariably be reversed unless the record *explicitly shows* that the jury *did not* rely on the

erroneous theory. Such a rigid rule would be at odds with *People* v. *Watson* [(1956) 46 Cal.2d 818, 836–837 [299 P.2d 243]], which sought to eliminate the notion that the 'mere possibility' of prejudice from trial error warrants reversal under article VI, section 13 of the California Constitution . . . ." (*Soule, supra,* 8 Cal.4th at p. 581, fn. 11.) The court noted that article VI, section 13's reference to " 'misdirection of the jury' . . . logically includes every kind of instructional error. It seems manifest that incorrect, ambiguous, *conflicting,* or wrongly omitted instructions may equally 'misdirect' the jury's deliberations." (*Soule,* at p. 579, italics added.)

We apply *Soule*'s "uniform test for civil instructional error," which asks if it is reasonably probable the error affected the verdict.

### 2. *Interpretation of the Contract*

Before trial, the court informed the parties that issues of contract interpretation were questions of law that the court would decide based on the written terms of the parties' contract and any relevant extrinsic evidence presented at trial (subject to the jury's resolution of factual conflicts in the extrinsic evidence). The jury would decide issues of breach and damages.

At the close of TJEG's case, the court heard argument on Ratcliff's motion for nonsuit, and focused on the issue of TJEG's right to claim additional fees for Basic Services under the Ratcliff/TJEG Contract. Among other things, Ratcliff argued that TJEG's claims for additional work based on an increase in the basic scope of work on the project (including the additional contract administration claims) were precluded by the incorporated provisions of paragraph 5 of the Ratcliff/County Contract and that paragraph 5.05 ("Substantial changes in the Project's scope shall provide sufficient basis for renegotiation of [Ratcliff's] fee") was an unenforceable agreement to agree. TJEG argued that, under the authority of *Coleman Engineering Co. v. North American Aviation, Inc.* (1966) 65 Cal.2d 396 [55 Cal.Rptr. 1, 420 P.2d 713] (*Coleman*), such contract modifications were within the contemplation of the parties, enforceable even in the absence of prior agreement on price or cost, and required the parties to negotiate in good faith for an appropriate adjustment.

In *Coleman,* the parties' contract (which consisted of purchase orders) included a provision that " 'Buyer reserves the right at any time to make changes in drawings and specifications . . . . In such event there will be made an equitable adjustment in price and time of performance mutually satisfactory to Buyer and Seller . . . .' " (*Coleman, supra,* 65 Cal.2d at p. 400.) When changes later occurred, the plaintiff requested an adjustment in both the price and the time for performance. (*Id.* at p. 401.) Negotiations on a new fee were

unsuccessful, and the plaintiff stopped working on the project. The defendant argued that the plaintiff's termination of work was a breach. (*Id.* at pp. 401–402.) The Supreme Court held, "[T]he effect to be given to the provision for adjustment of price to the mutual satisfaction of the parties [i.e., an agree-to-agree provision] should not be determined merely from the written agreement itself but should depend upon the changes requested. . . . Undoubtedly, if the subsequent changes are minor or of not great magnitude the contractor must perform and obtain a subsequent judicial determination as to the price of the changes. However, where the changes are of great magnitude in relation to the entire contract, the contractor must negotiate in good faith to settle the price [citation], and where he has done so, he is not required to continue performance in the absence of an agreement as to the price." (*Id.* at p. 406.) TJEG argued that *Coleman* "doesn't say you have to stop working[.] . . . [If] you keep working you are going to get your recovery at the end on the contract." The court found *Coleman* to be controlling authority.

The trial court ultimately provided special jury instructions on the meaning of the parties' contract. The trial court first instructed the jury that: "The written contract admitted in evidence as Exhibits 57 [Ratcliff/TJEG Contract] and 37 [TJEG's August 11, 1993 letter and enclosures, which included TJEG's August 13 and 17, 1992 letters to Ratcliff], as amended by the parties, governs the rights and duties of the parties. It is my job as judge to interpret the meaning of this contract, and therefore, I will tell you what the contract means. [Ratcliff] and [TJEG] entered into a consulting agreement whereby [TJEG] agreed to perform mechanical, electrical, and plumbing design services, as required in the agreement, based on the [KMD] report. [Ratcliff] agreed to pay [TJEG] a fixed fee for those services. [TJEG] was required to perform Basic Services for the mechanical, plumbing, fire protection, and electrical portions of the Project in accordance with the consulting agreement, and in accordance with [Ratcliff's] agreement with the [County] insofar as it required Basic Services for the mechanical, electrical, and plumbing systems. . . ."

The trial court then provided what hereafter will be referred to as the "*Coleman* instruction": "The contract provides methods for an adjustment in the contract price; one method for Basic Services and one method for Additional Services. For Basic Services, the agreement requires [TJEG] and [Ratcliff] to negotiate in good faith for an appropriate adjustment in fee if there is a substantial change in the scope of the Project. If an agreement on an adjustment in fee was reached, [TJEG] was required to perform the substantial change in the scope of the Project and [Ratcliff] was required to pay for the work as agreed. If no agreement on the adjustment in fee was reached, [TJEG] was entitled to be paid the reasonable value of the work performed, if any."

Regarding issues related to Basic and Additional Services, the court provided the following instructions: "To recover for a substantial change in the scope of Basic Services, [TJEG] must prove by a preponderance of the evidence that:

"a. There was a substantial change in the scope of the Project that resulted in extra work for [TJEG];

"b. That [Ratcliff] directed [TJEG] to perform the work;

"c. That [TJEG] performed the work; and

"d. That [Ratcliff] did not pay [TJEG] for the work; and

"e. [TJEG] must prove the amount of its damages." (Hereafter referred to as the Basic Services burden instruction.)

"To recover for Additional Services, [TJEG] must prove by a preponderance of the evidence that:

"a. [Ratcliff] directed [TJEG] to perform Additional Services;

"b. That [TJEG] performed the Additional Services; and

"c. That [Ratcliff] did not pay [TJEG] for the work.

"d. [TJEG] must prove the amount of its damages."

"In determining whether [TJEG] was entitled either to additional fees for a substantial change in the scope of Basic Services or Additional Services, an amendment to the Owner-Architect Agreement was not a precondition for [Ratcliff] to become obligated to pay [TJEG] any money for work performed by [TJEG]. [¶] [TJEG] was not required to obtain written authorization from [Ratcliff] or the County for a substantial change in the scope of Basic Services. [TJEG] was not required to obtain any authorization from the County. [Ratcliff] was required to obtain authorization from the County for a substantial change in the scope of Basic Services. [TJEG] was entitled to rely on [Ratcliff] to satisfy any obligation for County authorization of a substantial change in the scope of Basic Services.

"The contract documents require written authorization to [TJEG] from [Ratcliff] for Additional Services. However, if you find that [Ratcliff] issued oral direction to [TJEG] for Additional Services, that [TJEG] complied with such oral direction and provided such Additional Services, and that [Ratcliff]

accepted [TJEG]'s performance, then you may find that [Ratcliff] has waived the requirement that Additional Services shall require written authorization from the Architect. [Ratcliff] was required to obtain authorization from the County for Additional Services. [TJEG] was entitled to rely on [Ratcliff] to satisfy any obligation for County authorization for Additional Services."

The court also provided a number of standard instructions on contract law, which we discuss *post* to the extent necessary.

### a. *Basic Services*

Ratcliff first argues that the special instruction's discussion of Basic Services compensation was internally inconsistent and legally erroneous. According to Ratcliff, *Coleman, supra*, 65 Cal.2d 396, holds that parties who have an agree-to-agree provision in their contract must negotiate in good faith when a change arises, but it does not hold that a performing party is guaranteed payment for its work in the absence of a successfully negotiated agreement on a new fee. Rather, in the absence of a renegotiated fee, the performing party must either stop work on the job or perform the modified scope of work for the original fee.

Ratcliff thus argues the following two sentences in the *Coleman* instruction correctly reflect the *Coleman* holding: "For Basic Services, the agreement requires [TJEG] and [Ratcliff] to negotiate in good faith for an appropriate adjustment in fee if there is a substantial change in the scope of the Project. If an agreement on an adjustment in fee was reached, [TJEG] was required to perform the substantial change in the scope of the Project and [Ratcliff] was required to pay for the work as agreed." However, Ratcliff contends that the next sentence is inconsistent with *Coleman* and contradicts the first two: "If no agreement on the adjustment in fee was reached, [TJEG] was entitled to be paid the reasonable value of the work performed, if any."

■ We believe that the trial court's interpretation and application of *Coleman* was correct. *Coleman* addressed the enforceability of a construction contract which included a provision for renegotiation of the contract fee in the event of substantial changes in the project scope of work (an agree-to-agree provision). (*Coleman, supra*, 65 Cal.2d at p. 405.) As a general principle, the court held that the enforceability of a contract leaving some of its terms to future determination depends on the relative importance of the unsettled term. (*Ibid.*) Where "the indefinite promise is so essential to the bargain" that an inability to enforce it renders enforcement of the remainder of the contract unfair, the contract may be abandoned. If "the matters left for future agreement are unessential, each party will be forced to accept a reasonable determination of the unsettled point or if possible the unsettled

point may be left unperformed and the remainder of the contract be enforced." (*Ibid.*) In the construction context, "if the subsequent changes are minor or of not great magnitude the contractor must perform and obtain a subsequent judicial determination as to the price of the changes. However, where the changes are of great magnitude in relation to the entire contract, the contractor must negotiate in good faith to settle the price [citation], and where he has done so, he is not *required* to continue performance in the absence of an agreement as to the price." (*Id.* at p. 406, italics added.)

■ What *Coleman* does not expressly address is whether a contractor faced with a substantial change in its originally contracted scope of work, who is unable to successfully negotiate a price for that additional work, may elect to continue to work and reserve its right to subsequently obtain a judicial determination as to the value of the changes. The trial court concluded that it may and we agree. So long as the other contracting party continues to demand performance of the increased scope of work, and in the absence of any conflicting provision of the contract, the contractor may continue to work after unsuccessful negotiations and subsequently recover the value of that work. To hold otherwise would compel a contractor to walk off the job in the face of what it believes to be major changes in the scope of work required of it, with significant consequences if its judgment is later proven wrong, or alternatively forfeit any right to seek compensation for that work, regardless of the extent of the additional burdens imposed. It would also be particularly anomalous to read *Coleman* as permitting a contractor to obtain a subsequent judicial determination of the value of changes to the scope of work that "are minor or of not great magnitude," while denying the contractor the right to such a determination and any recovery where "changes are of great magnitude in relation to the entire contract." The interpretation urged by Ratcliff is also impractical and economically inefficient. Construction projects pose complex time management challenges, requiring multiple contractors and subcontractors to coordinate their efforts as numerous design revisions and change orders inevitably arise. To complete these projects efficiently, the parties must be able to continue working despite contract disputes, with reasonable assurances of the ability to ultimately obtain a fair resolution of those disputes.[13]

---

[13] Although both paragraph 5.05 of the Ratcliff/County Contract and *Coleman* speak of "substantial" changes to the contract, the term necessarily has different meanings in the two contexts. Under paragraph 5.05, a "substantial" change in the scope of work is a basis for renegotiating the Basic Services fee. "Substantial" thus necessarily encompasses any change in the scope of work that warrants additional compensation, including "minor" changes as that term is used in *Coleman* (which *Coleman* holds the contractor must perform, subject to later compensation). In *Coleman*, a "substantial" change that entitles a contractor to stop working on a project in the absence of a renegotiated fee is one that is "substantial in relation to the remainder of the agreement so that the provision for change orders becomes an 'essential element' of the contract . . . ." (*Coleman, supra,* 65 Cal.2d at p. 406.) The change is great

The jury was told that the parties were required to negotiate in good faith to set a new fee if the scope of work in the contract changed substantially. To the extent they agreed upon compensation, TJEG was entitled to recover the agreed-upon amount. To the extent that negotiations were unsuccessful and Ratcliff nevertheless directed TJEG to perform the work, TJEG was entitled to compensation for the fair and reasonable value of the additional work it performed pursuant to that direction. The instruction as a whole correctly reflects the trial court's reading of *Coleman*, which we approve.

Ratcliff next argues that the Basic Services burden instruction "abandoned the *Coleman* rule altogether, saying nothing about a renegotiated fee. Now, inexplicably, [TJEG] had to prove only that Ratcliff 'directed' work constituting a substantial change in basic services." As noted, however, Ratcliff misreads both *Coleman* and the *Coleman* instruction to permit recovery only if negotiations on a new fee culminate in a mutual agreement. In fact, the trial court interpreted *Coleman* to allow a party that performed the increased work to be paid in any event: it must be paid the agreed-upon fee if negotiations are successful, and the fair and reasonable value of the work if negotiations are unsuccessful. The Basic Services burden instruction is consistent with this rule and the court thus correctly instructed the jury.

Finally, Ratcliff complains that "the jury had to guess whether *any* agreement was required" and whether a breach needed to be proven, issues raised by the court's standard instructions on contract law but not directly addressed in the special instruction. We see no confusion in the instructions when they are read as a whole. The trial court instructed the jury that "[t]he written contract admitted as Exhibits 57 and 37, as amended by the parties, governs the rights and duties of the parties." That is, the court itself determined the existence and terms of the parties' underlying contract. The court further instructed the jury that "[t]he contract provides methods for an adjustment in the contract price" and described in the *Coleman* instruction the method of adjusting the Basic Services compensation based on a substantial increase in the scope of work. The standard instructions on reaching an agreement were relevant to the jury's determination of whether Ratcliff and TJEG had actually negotiated a new fee between themselves based on the increased scope of work. The standard instructions on breach of contract were relevant to the jury's determination of whether Ratcliff had paid TJEG for either the agreed-upon value, or the reasonable value, of Basic Services work TJEG actually performed that was outside the original scope of the Project.

---

enough not only to call for additional compensation, but also to allow a party to abandon the contract altogether. We need not decide whether the change of scope in TJEG's work on the Project was "substantial" in the *Coleman* sense because TJEG never stopped performing on the contract until Ratcliff itself terminated its contract with the County.

The Basic Services burden instruction clearly and correctly set forth this framework for the jury to follow. There was no reasonable probability of confusion.

 b.–e.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Motion for Prejudgment Interest*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## IV. DISPOSITION

The judgment and the August 2008 award of attorney fees and costs are affirmed. TJEG's protective cross-appeal is dismissed as moot. Ratcliff shall pay TJEG's costs on appeal.

Jones, P. J., and Simons, J., concurred.

---

[*]See footnote, *ante*, page 945.