Filed 5/27/14 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| AMERICAN MASTER LEASE LLC, | B244689 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC367987) |
| v. | |
| IDANTA PARTNERS, LTD. et al., | ORDER MODIFYING OPINION, NO CHANGE IN JUDGMENT |
| Defendants and Appellants. | |

THE COURT:

It is ordered that the opinion filed herein on May 5, 2014, be modified as follows:

1. On page 30, lines 3 to 11, the citation beginning with "See Corp. Code" and ending before the citation to "*Huong Que, Inc.*" is deleted and the following is inserted in its place:

> See former Corp. Code, § 17153 ["[t]he fiduciary duties a manager owes to the limited liability company and to its members are those of a partner to a partnership and to the partners of the partnership"];[18] former Corp. Code, § 17001, subd. (w) ["manager" includes each of the members unless the articles of organization state that one or more members will manage the company];

2. On page 30, the text of footnote 18 is deleted and the following is inserted in its place:

> [18]The events of this case are governed by former section 17153 of the Corporations Code. Corporation Code section 17704.09, which replaced

former Corporations Code section 17153, "applies only to the acts or transactions by a limited liability company or by the members or managers of the limited liability company occurring, or contracts entered into by the limited liability company or by the members or managers of the limited liability company, on or after January 1, 2014. The prior law governs all acts or transactions by a limited liability company or by the members or managers of the limited liability company occurring, or contracts entered into by the limited liability company or by the members or managers of the limited liability company, prior to that date." (Corp. Code, § 17713.04, subd. (b).) The new statute provides that members of a limited liability company owe fiduciary duties of loyalty and care to the limited liability company, including the duties to "refrain from dealing with a limited liability company in the conduct or winding up of the activities of a limited liability company as or on behalf of a party having an interest adverse to a limited liability company" and to "refrain from competing with a limited liability company." (Corp. Code, § 17704.09, subd. (b)(2), (3); see *id.*, subd. (d) ["[a] member shall discharge the duties to a limited liability company and the other members under this title or under the operating agreement and exercise any rights consistent with the obligation of good faith and fair dealing"].)

3. On page 30, at the end of the insert noted in No. 1 above, add as footnote 19 the following footnote, which will require renumbering of all subsequent footnotes:

[19]The Operating Agreement for AML named Roberts as the managing member, but provided that the members "may determine that there should be more than one Manager." The January 2000 management agreement gave Andrews, Runnels, and Franklin control over AML's "operational decisions" and responsibility at "both the senior management (operational) level as well as the board-level (leadership) level."

There is no change in the judgment.


_____      _____      _____
PERLUSS, P. J.          ZELON, J.          SEGAL, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

Filed 5/5/14    Opinion following rehearing (unmodified version)

# CERTIFIED FOR PUBLICATION

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION SEVEN

| | |
|---|---|
| AMERICAN MASTER LEASE LLC, | B244689 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC367987) |
| v. | |
| IDANTA PARTNERS, LTD. et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment and an order of the Superior Court of Los Angeles County, Ramona G. See, Judge.  Affirmed in part and reversed in part with directions.

Lathrop & Gage, John Shaeffer, Jeffrey Grant and Emily Birdwhistell for Defendants and Appellants.

Mayer Brown, Donald Falk; Mayer Brown, Neil M. Soltman and Germain D. Labat for Plaintiff and Respondent.

_____

## INTRODUCTION

In this appeal we consider the questions (1) whether a defendant can be liable for aiding and abetting breach of fiduciary duty without owing the plaintiff a fiduciary duty, (2) what is the statute of limitations for aiding and abetting breach of fiduciary duty, (3) whether the restitutionary remedy of disgorgement is available for aiding and abetting breach of fiduciary duty, and (4) what is the measure of restitution for aiding and abetting breach of fiduciary duty. We answer these questions (1) yes, (2) three or four years (depending whether the breach is fraudulent or non-fraudulent), (3) yes, and (4) the net profit attributable to the wrong.

Defendants Idanta Partners, Ltd., David J. Dunn, Steven B. Dunn, and the Dunn Family Trust appeal from a judgment on a jury verdict in favor of plaintiff American Master Lease LLC (AML) and from an order denying their motion for judgment notwithstanding the verdict. The jury found defendants liable for aiding and abetting breach of fiduciary duty and awarded restitution in the amount of approximately $5.8 million. Defendants argue that the judgment must be reversed because they cannot be liable for aiding and abetting breach of fiduciary duty in the absence of a duty owed directly to the plaintiff, and because the aiding and abetting claim is barred by the applicable statute limitations. We find no merit in these contentions, but we do conclude that defendants are entitled to a new trial on the amount of defendants' unjust enrichment. After having granted a petition for rehearing by AML in order to give the parties an opportunity to file supplemental briefs on the valuation timing issue for restitution, we affirm in part and reverse in part for a new trial on the amount of restitution.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

A. *AML*

Neal Roberts formed AML in 1998 for the purpose of investing in real estate. He observed that there were people his age who owned real property but were reaching a point in their lives where they wanted to retire and did not want to continue actively managing their real estate investments. Roberts' idea was to allow these investors to sell their real estate to a larger entity and then buy interests in the larger entity as tenants in common, which would allow them to avoid adverse tax consequences associated with the sale of the real estate. This investment vehicle became known as a 1031 FORT, where 1031 referred to the section of the Internal Revenue Code applicable to real estate exchanges and FORT stood for Fractionalized Ownership in Real estate Tax deferred.

AML initially had seven members. Roberts and three trusts that he set up for his wife, his son, and his daughter owned 75 percent of AML. Jim Andrews, the Roberts family lawyer, Charles "Duke" Runnels (Runnels), and Michael Franklin owned the remaining 25 percent. Andrews, Runnels, and Franklin had participated in a company Roberts formed prior to AML, and Roberts wanted them involved in AML. Roberts was the managing member of AML.

The AML Operating Agreement included an agreement not to compete. Paragraph 3.9 provided: "The Members agree that the business of the LLC, either to sell AML Products[2] . . . directly to purchasers or to sell AML Products indirectly through an accommodator as part of a tax-exempt transaction, is unique. . . . No Member, Principal of a Member or holder of an Economic Interest of a Member, may have any interest,

---

[1]  "We state the facts in the light most favorable to the jury's verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment." (*Green Wood Industrial Co. v. Forceman Internat. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 770, fn. 2.)

[2]  Paragraph 1.4 of the Operating Agreement defines "AML Products" as "direct or indirect tenancy-in-common interests in real property."

3

directly or indirectly, in any business that offers to sell or exchange AML Products or is otherwise competitive with [AML], nor may any such Member, Principal or Economic Interest holder be employed by, or act as a consultant to, any such competitive business without the approval of a Majority In Interest of the Class A and Class B Members, voting as a Class. . . ."

B.    *The Dunns and Idanta Partners, Ltd. (Idanta)*

David J. Dunn was the founder and managing general partner of Idanta, a venture capital firm that for over 40 years had specialized in helping entrepreneurs create and finance new companies.  David Dunn was also the sole trustee of the Dunn Family Trust, which held the bulk of his assets.  David Dunn's son, Steven, worked for Idanta for about two-and-a-half years and was a partner in Idanta for some of that time.  Steven left Idanta in 1987 or 1988.

David Dunn and the other active partners owned about 20 percent of Idanta. Members of the Bass family, a wealthy Texas family engaged in the oil business, owned the other 80 percent as limited partners.  The Bass family invested $7 or $8 million in Idanta.

C.    *AML Seeks Investment Partners*

AML needed an investment partner to provide funding to purchase commercial properties.  The first partner, in the late 1990's, was Ethan Penner and an entity he created for that purpose, T-Rex.  Roberts knew about and approved the joint venture with T-Rex.  The joint venture was supposed to pay the salaries of Runnels and Franklin, and Roberts contributed money to the joint venture to help pay for their compensation. Before the joint venture could complete any transactions, however, Penner withdrew for financial reasons, and the joint venture was dissolved in 1999.

In January 2000 Roberts, Andrews, Runnels, and Franklin entered into a management agreement with AML.  While Roberts remained the managing member and Chairman of the Board, Andrews, Runnels, and Franklin agreed to function as the

4

operational management of AML (collectively the Operating Group). In addition, their interests in AML increased to 13-1/3 percent each, while Roberts' interests decreased to 60 percent. The management agreement also required Runnels and Franklin to use their best efforts to find a new investment partner.

In July 2000 the Operating Group identified CB Richard Ellis as a potential investment partner. Again with Roberts' knowledge and approval, AML entered into a relationship with the newly formed CB Richard Ellis Investors 1031 (CBREI). In December 2001 AML entered into an exclusive license agreement with CBREI for FORT transactions. During the course of the relationship CBREI grossed $86 million and paid AML $500,000.

In the summer of 2003 CBREI lost its financing after its funding source refused to fund the transactions. That fall, Roberts told the Operating Group that they should consider terminating AML's relationship with CBREI and searching for a new investment partner.[3]

At a November 7, 2003 AML board meeting, the Operating Group suggested two possibilities for a new investment partner: Idanta and Warburg-Pincus. A dispute arose at the meeting, however, between the Operating Group and Roberts. Roberts was concerned about protecting AML's business method, while the Operating Group wanted to proceed with finding a new investment partner. Roberts vetoed the Operating Group's proposal to pursue a new investment partner. Roberts then presented the Operating Group with an amendment to AML's Operating Agreement, signed by him and the trustee of the three trusts. The purpose of the amendment was to make it "absolutely clear that no deal could get done without the approval of the majority interest in the company."

---

[3]     In December 2003 AML converted CBREI's exclusive license to a nonexclusive license and gave CBREI time to find new financing or face termination of the agreement with AML.

D.    *Idanta and AML Explore the Possibility of a Relationship*

Steven Dunn played tennis with Tyler Runnels, Charles Runnels' brother.  In the fall of 2003 Tyler Runnels had Steven Dunn introduce him to David Dunn to discuss a loan to AML.  Charles Runnels and Franklin were looking for a loan for a FORT transaction in conjunction with the CBREI joint venture.  David Dunn initially refused to provide a loan commitment.  At some point, however, he provided a loan commitment of $5.1 million in exchange for $177,000, but he never had to make the loan.  David Dunn later tried to put together a joint venture between Idanta and CBREI but was unsuccessful.

In January 2004 David Dunn proposed a transaction that would not include CBREI.  Idanta would form and finance a new company in which Idanta would own 80 percent, Runnels and Franklin would own 15 percent and manage the company, and AML would own 5 percent.  This proposal was unacceptable to Roberts because Runnels and Franklin would be "getting far too much of the deal when, in fact, it's an AML deal . . . ."  Roberts also objected to the interest rate Idanta wanted to charge for loans to the new company, and he did not want to grant the new company an exclusive license to engage in FORT transactions.[4]

On January 13, 2004 David Dunn met with Runnels to discuss the situation.  He told Runnels that he was "still interested" in the transaction.  He gave Runnels "a lot of good reasons why he [was] better off with an independent entity like Idanta as opposed to being tied to a major realty firm" like CBREI.

By the end of January 2004 the relationship between Roberts and the Operating Group was strained.  Roberts and the Operating Group retained separate legal counsel.

---

[4]    At the time AML had granted exclusive licenses to T-Rex and CBREI, no one else was engaging in FORT transactions.  According to Roberts, "by the time we get to 2004, there's a whole bunch of companies that seemed to be stealing our ideas that you could have gone after who were doing billions of dollars of business, and so I wasn't about to give that to some venture capital entity to take care of because I didn't think they knew anything about it."

Roberts was allowed to speak with representatives of Idanta only if Franklin introduced him and was present at the meeting.

On February 5, 2004 Franklin wrote to Roberts to set up a meeting with Steven Dunn. He urged Roberts to review the paperwork, "which shows that the IDANTA offer has an approximate value of $26.5 Million to AML with the majority of that coming from FORT sales activity. . . . You seem willing to 'bet the farm' on potential licensing revenue when we certainly have an excellent opportunity to be in business immediately, producing FORT's, generating income and creating value."

On February 10, 2004 Andrews, Runnels, and Franklin sent Roberts a compromise proposal regarding the proposed new company. Under this proposal, "AML [would] accept the Idanta proposal and issue it an exclusive license of the AML business method . . . ." The agreement not to compete would be eliminated from AML's Operating Agreement. The November 2003 amendment to the Operating Agreement would be rescinded, and any future amendments would require the approval of the Operating Group.

On February 19, 2004 Roberts presented the Operating Group with his counterproposal. His "central policy issue" was the protection of AML's intellectual property. He proposed entering into a joint venture with Idanta, with AML having at least a 20 percent interest in the new company. AML would grant the new company a nonexclusive license to use the AML business method. The Operating Group sent Roberts' proposal to Steven Dunn, who forwarded it to David Dunn.

In late February 2004 Roberts met with Steven Dunn. Roberts told Steven Dunn that he did not approve of David Dunn's proposal and that they "had to work out a way to go forward that was acceptable to the controlling members, . . . majority in interest in" AML. Roberts told Steven Dunn about disputes with the Operating Group and "that I controlled the company. And I also specifically told him—I think I used the phrase 'dirty linen,' that we would attempt to clean up the 'dirty linen' if we were going to proceed."

7

E.      *The Operating Group Forms a New Company and Grants It a License;*
        *Idanta and the Dunns Buy Into It*

In approximately mid-March 2004 Runnels incorporated FORT Properties, Inc. (FPI), with himself and Franklin as FPI's owners. David Dunn had already negotiated with Runnels and Franklin an ownership interest in FPI for himself, the Dunn Family Trust, and Idanta. Initially, Runnels and Franklin owned 100 percent of the shares of FPI. In April 2004 defendants purchased preferred shares in FPI for $2.3 million, which gave defendants an 85 percent ownership interest in FPI. The Operating Group, on behalf of AML, then granted FPI a nonexclusive license to use AML's business method. Runnels signed the licensing agreement on behalf of FPI; Andrews, Runnels, and Franklin signed on behalf of AML.

On March 15, 2004 David Dunn wrote to Sid Bass, one of Idanta's partners, about the deal. David Dunn expressed his belief that "we are involved with first-rate professionals who have an opportunity to build a very large strongly financed business." David Dunn further stated that "once we have done a couple of successful transactions and, again, this management has done successful transactions, we will be able to increase the number of deals we do through obtaining additional layers of capital. We also believe that if we become the major player in the industry, we will have a very attractive vehicle for a public offering." David Dunn explained that Runnels and Franklin "finally lost patience with CBRE" due to the failure to provide the promised financing. While "the majority holder" of AML's business method (i.e., Roberts) wanted to go after infringers, Runnels and Franklin were not interested in pursuing this course of action. They intended to draft a non-exclusive license for FPI to use the business method. Andrews, Runnels, and Franklin, "as the operating people (non-employees) of AML will inform the majority . . . holder of their action sending him copies of the FORT Property license and a copy of the deposited check" for the license.

Runnels and Franklin wrote to Roberts on March 17, 2004 that his February 19 proposal "misse[d] the mark." They explained: "Your opposition to any exclusive license arrangement is noted, and as a result we have been actively seeking parties in

8

addition to CBREI who are willing to enter into nonexclusive licenses. In this regard, the Operating Group has granted a nonexclusive license to [FPI], a newly formed entity." The royalty rate was the same as the royalty rate paid by CBREI, and FPI paid an advance against royalties of $50,000. Runnels and Franklin stated that they "believe[d] the license agreement with FPI is fair and reasonable and can provide a launching pad for the AML licensing operation."

Runnels and Franklin also stated that Roberts' proposal that they work for the proposed venture between AML and a new company was unacceptable. They pointed out that they "have never been employees of AML and do not plan to be in the future." They also stated that they had been informed by counsel that paragraph 3.9 of the AML Operating Agreement was "an unenforceable attempt to restrict employment under California law." They notified Roberts that "[Runnels] has decided to join FPI as its President with a view to bringing it into the 1031 TIC[5] business. [Runnels] and other management personnel will purchase an equity interest in FPI. [Franklin] will likely also accept an offer for employment and affiliate himself with FPI."

Roberts received the letter on March 22, 2004. He researched FPI and discovered that Runnels was its the sole incorporator. He sent an email to Runnels and Franklin stating that he was "obviously disheartened" to learn of their conclusion that his proposal "'misse[d] the mark' but [was] hopeful that your comments about moving forward to protect the Company's intellectual property and generate revenue can lead to an agreement in that sphere." He also stated his belief that Runnels and Franklin were "bound by the non-compete provisions of the operating agreement and that you have never had the authority to make exclusive or non-exclusive licenses on behalf of the company . . . ."

Runnels forwarded the email to David Dunn. David Dunn was aware that the authority of Runnels and Franklin to enter into the license agreement was questionable,

---

**5** Tenant in common.

9

but he let his son Steven, who knew about licenses, deal with the issue. Having read the email, however, David Dunn did not believe that Roberts had vetoed the license agreement. Franklin later reported to David Dunn that he had met with Roberts and given him the $50,000 check for the advance against royalties. After discussing the matter, Roberts said, "'I don't know whether this is the best thing that ever happened to us or whether I've been f'd.' And [Franklin] said he told him it was the best thing that ever happened to him."

F.     *Roberts Objects*

On September 28, 2004 Roberts' attorney, Neil M. Soltman, wrote to Steven Dunn. He stressed that Roberts and his family owned a majority interest in AML, and that AML owned a business method for performing tax-deferred real estate exchanges. "The 1998 Operating Agreement . . . specifically provides that without the approval of a majority in interest of AML's owners, no member of AML may have any interest, directly or indirectly, in any business that offers to sell or exchange AML products or is otherwise competitive with AML, nor may any member be employed by or act as a consultant to any such competitive business. Neither the 2003 Amendment to the Operating Agreement nor any side agreement signed by some of the members of the company in any way changed these provisions." Soltman noted that Roberts had learned that Runnels had formed FPI "and that three members of AML ([Andrews, Runnels, and Franklin]) who do not collectively own a majority in interest in AML have executed a document which purports to grant a non-exclusive license of the AML [business method] to FPI. At no time has the majority in interest of AML's owners approved of that license." Having learned of the investment in FPI by Idanta and the Dunns, Soltman informed them that the license was not authorized. Soltman advised: "If the actions of the three individuals are, as we are now of the opinion, in breach of their duties under the AML Operating Agreement and their fiduciary duties to AML . . . , it then follows that all compensation that they receive of any type . . . does and will continue to belong to AML. Since at least one of the three individuals formed FPI and executed the license on behalf

of FPI and AML, FPI is on notice that all such compensation is to be held in trust for the benefit of AML. [¶] In addition, if FPI knowingly infringes the AML [business method], FPI will be liable to AML for all proceeds from the enterprise and for all available damages and remedies under the patent laws of the United States and similar state and federal laws or decisions." Steven Dunn sent Soltman's letter to David Dunn, who now understood that Roberts was objecting to the transaction.

On October 25, 2004 counsel for Idanta responded to the letter and stated that "Steve Dunn is not affiliated with Idanta Partners. Furthermore, the investment that you mentioned by Idanta Partners in Fort Properties, Inc. has been concluded. [¶] Since it appears that the matters you raise in your letter concern disputes between Neal Roberts and the other members of AML . . . , Idanta partners believes it is appropriate for those parties to resolve those matters among themselves without the involvement of Idanta Partners."

### G. *FPI's FORT Transactions*

Within a month after Soltman sent his letter, FPI cancelled the license agreement with AML. FPI engaged in several FORT transactions without AML, with its first FORT transaction closing in November 2004. Idanta and the Dunn Family Trust provided financing for these transactions in the amount of $2.5 million "[p]lus a commitment to put in up to 25 million for subordinated loans on [each] individual [FORT] transaction." FPI paid Idanta and the Dunn Family Trust $2,450,000 in interest on total loans of approximately $74 million, at prime plus 8 percent.

### H. *Roberts Institutes Arbitration Proceedings Against Andrews, Runnels, and Franklin*

At some point Roberts commenced arbitration proceedings against Andrews, Runnels, and Franklin. On December 4, 2008 the arbitrator issued a final arbitration award, finding that some of the conduct by Runnels and Franklin constituted a breach of their fiduciary duties to AML, and some of it did not. "[T]he Arbitrator found [that] the

11

appropriate remedy was an equitable remedy of requiring Runnels and Franklin to transfer a certain percentage of the [FPI] shares to Roberts based on his 60% ownership in AML." Roberts filed a petition to confirm the arbitration award, but the parties to the arbitration settled their disputes and Roberts dismissed the petition. (*Roberts v. Andrews* (Super. Ct. L.A. County, 2009, No. BS120091).)

I.     *Idanta and the Dunn Family Trust End Their Relationship With FPI*

On March 15, 2007 AML filed this action against Idanta, the Dunn Family Trust, David Dunn and Steven Dunn, and Jonathan Huberman,[6] one of Idanta's partners. AML alleged causes of action for aiding and abetting breach of fiduciary duty, inducing breach of contract, conspiracy to induce breach of contract, interference with contractual relations, conspiracy to interfere with contractual relations, unfair competition, and unjust enrichment.

A few months later, in June 2007, FPI agreed to pay Idanta and the Dunn Family Trust $5.8 million for the preferred stock they had purchased in April 2004 for $2.3 million. The initial payment for the repurchase of the stock was $2.9 million, with the payment of another $2.9 million after closing.[7] FPI made the first $2.9 million payment, and then, during the pendency of this litigation in 2009, paid $300,000 towards the

---

[6]     Huberman is not a party to this appeal.

[7]     It is unclear from the record whether the second payment from FPI to defendants was a fixed $2.9 million or some percentage of FPI's profits that may have been valued at $2.9 million. AML's expert, Kelly Melle, testified that there was a "closing payment" of $2.9 million and a "post closing payment" of another $2.9 million. During discussions with the court over the jury instructions, however, counsel for AML stated that the terms of defendants' sale of their stock back to FPI had "a cash component" (presumably the first $2.9 million payment) and a "retained . . . future profit interest" in FPI of "25 percent of [FPI's] profits," and that Melle was going to value this "25 percent profit interest" at over $2 million. Neither side points to any direct evidence of the terms of this transaction, and the copy of Melle's demonstrative exhibit that might shed light on this issue is illegible. For purposes of this appeal, we assume that the June 2007 transaction between defendants and FPI contemplated two $2.9 million payments.

12

second $2.9 million payment. Idanta and the Dunn Family Trust agreed to accept an additional $100,000 in lieu of the remaining $2.6 million owed on the second payment. From March 2004 through December 2009 FPI experienced a net loss of about $600,000 to $700,000.

J.      *The Litigation*

1.      Rulings on the Pleadings

On July 5, 2007 defendants filed a demurrer to AML's first amended complaint. They argued in part that AML could not state a claim for aiding and abetting a breach of fiduciary duty because they did not owe a fiduciary duty to AML. The trial court, Hon. Edward Ferns, sustained the demurrer with leave to amend. The court ruled that while a defendant must owe an independent duty to the plaintiff in order to be liable for conspiracy to breach that duty (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 510-511), a defendant need not owe an independent duty to the plaintiff in order to be liable for aiding and abetting a breach of that duty (*Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1144). In other words, the court ruled that aiding and abetting is an independent tort even though conspiracy is not. The court nevertheless sustained the demurrer to AML's aiding and abetting cause of action on the ground AML had failed to plead sufficient facts to state a cause of action for aiding and abetting a breach of fiduciary duty by Andrews, Runnels, and Franklin. Specifically, the court ruled that AML had not sufficiently alleged that defendants knew the conduct of Andrews, Runnels, and Franklin constituted a breach of fiduciary duty, or that defendants gave the three of them substantial assistance or encouragement.

On June 27, 2008 AML filed its fourth amended complaint alleging causes of action for aiding and abetting a breach of fiduciary duty, interference with contract, unfair competition, and unjust enrichment. The trial court sustained defendants' demurrer to the causes of action for unfair competition and unjust enrichment without leave to amend. The court ruled that although the conduct of Andrews, Runnels, and Franklin "in unfairly competing with [AML] may be considered" unfair competition,

13

AML was not entitled to injunctive relief or disgorgement under "California's unfair competition law."

### 2. Defendants' Motion for Summary Judgment

On June 26, 2009 defendants filed a motion for summary judgment or in the alternative summary adjudication. They argued that the arbitrator's ruling on AML's breach of fiduciary duty claim was collateral estoppel on AML's claim in this action, and that the arbitrator's equitable remedy gave Roberts "complete satisfaction." Defendants also argued that they could not be liable for interference with contract because paragraph 3.9 of the AML Operating Agreement, the agreement not to compete, was void and unenforceable. The trial court denied the motion on the grounds the parties in this case were not the same as the parties in the arbitration and that the unconfirmed arbitration award was not binding. The court did not address the validity of the non-competition agreement.

### 3. Evidence of the Unjust Enrichment

After multiple continuances, the trial finally began on June 13, 2012 before Judge Ramona See.[8] During the trial, AML's expert, Melle, testified that he was "asked to compute the dollar amount of the benefit that the defendants received [as of June 13, 2012] from a revolving loan agreement and a preferred stock sale."[9] Melle calculated that defendants earned $2,328,892 interest on loans to FPI between 2004 and 2007, and

---

[8] On February 27, 2012 the parties stipulated to a waiver of the five-year period in which to commence trial. (See Code Civ. Proc., §§ 583.310, 583.330, subd. (a).)

[9] Defendants had filed a motion in limine seeking to exclude evidence of "any alleged damage sustained by [AML] based upon the purported 'benefits' defendants received from" interest on the loan to FPI and the sale of FPI stock. Defendants argued that these amounts were not damages proximately caused by the tortious conduct alleged in the complaint. The trial court denied the motion as a "failed motion[] for summary adjudication."

14

that with prejudgment interest the total amount of this benefit was $3,399,287. The jury did not award this amount.

Melle also "did an analysis of the benefits [defendants] received" from the June 2007 sale of their FPI stock. The "sale called for a payment of 2.9 million dollars and then following the closing, other payments of another 2.9 million, for a total of 5.8 million dollars or 5,808,826 dollars." Adding interest through June 13, 2012, Melle calculated that the total amount of this benefit was $7,075,891.

Melle acknowledged that shortly after he had performed his calculations, "there were payments of about 300,000 dollars," and that defendants subsequently "took 100,000 dollars instead of [the remaining] 2.6 million." Melle's calculations, however, did not take into account the fact that defendants did not receive all of the second $2.9 million payment and therefore did not receive the entire $5.8 million. Nor did Melle take into account defendants' initial investment of $2.3 million to acquire the FPI stock. He stated that he did not take these facts into account because his task was to calculate the (gross) benefits defendants received "at the time they closed the deal," not "profits."

### 4. Jury Instructions

The court and counsel had several discussions, some before trial and some in the middle of trial, about the parties' proposed CACI and special jury instructions. AML objected to CACI No. 3900, "Introduction to Damages," because it instructed the jury on traditional tort damage theories, while AML sought restitution based on disgorgement and constructive trust. AML had drafted special instructions to cover its restitution theories. Defendants objected to AML's special instruction Nos. 3 and 4 regarding unjust enrichment and constructive trust, arguing that the trial court had previously sustained their demurrer to AML's cause of action for unjust enrichment and that there was nothing over which a constructive trust could be imposed. Defendants also objected to AML's special instruction Nos. 7 and 8 regarding the calculation of the amount of disgorgement and the imposition of a constructive trust with respect to the date as of which the restitution amounts should be calculated. Defendants argued that these instructions failed

15

to include any offset for amounts paid by defendants. The trial court took the matter of the jury instructions under submission.

During Melle's testimony, counsel for defendants attempted to question him on cross-examination about whether he had included any offsets in his calculations. Counsel for AML objected, pointing out that there was "an approved jury instruction, special number 8, which says the jury can't take that into account." After considering the matter the trial court ruled that it was going to modify this instruction to refer to "profit" rather than "economic benefit," because "[d]isgorgement deals with profit. And profit by its very definition is calculated less expenses." The record reflects, however, that the trial court ultimately did not give this instruction.[10]

### 5. Motion for Nonsuit

Following the conclusion of AML's case-in-chief defendants moved for a judgment of nonsuit "as to both claims on the basis that they are barred by the statute of limitations and as to the second cause of action for interference with contract on the basis that there has not been proof offered of a valid and enforceable contract." The trial court denied the motion and ruled that the limitations period for AML's cause of action for aiding and abetting a breach of fiduciary duty was four years pursuant to Code of Civil Procedure section 343 and *In re Brocade Communications Systems, Inc. Derivative Litigation* (N.D.Cal. 2009) 615 F.Supp.2d 1018, 1037. The trial court stated that the limitations period for interference with contract was two years. The court found, however, that "[a]lthough it appears that all aspects of the claims that are the subject of this lawsuit were known at the time of the September 28, 2004 letter sent by Neil Soltman to Steven Dunn . . . , there remain issues of fact for the jury to decide regarding

---

[10] The court reporter did not transcribe the trial court's reading of the instructions to the jury. This particular instruction does not appear in the set of written instructions included as given in the record on appeal.

16

the effect of a subsequent response letter from Idanta dated October 4, 2004 and the meaning of the word 'concluded' within that letter."

On the issue of the existence of a valid contract, the court noted that the ruling on defendants' summary judgment motion was that they "did not meet their burden of proof . . . , not that the defense or claims asserted by Defendants lacked merit." When defendants raised the issue again in a motion in limine, the trial court denied the motion "on the grounds that it was a disguised motion for summary judgment not that the substance of the motion lacked merit."

### 6. Deliberations

The trial court instructed the jury, pursuant to CACI No. 3900, that if it found AML had proved its claims against defendants, the jury then had to decide how much money would reasonably compensate AML for the "harm." The court instructed the jury pursuant to special instruction No. 3 that "[t]he elements of an unjust enrichment claim are (1) the receipt of a benefit from another; and (2) the unjust retention of the benefit at the expense of another," and that if the jury found that defendants were unjustly enriched at AML's expense, then it could "award [AML] the amount by which Defendant has been unjustly enriched."

During deliberations, the jury sent the court a note asking the court to define "harm" and "benefit." Counsel noted that there were no instructions defining "harm." Special instruction No. 4, Calculation of Disgorgement of Defendants' Benefits, referred to "profit," but the word "benefit" did not appear in the instruction. Over defendants' objection, the trial court instructed the jury, "These words are to be used in their plain and ordinary meaning. You are to read these words in the context of the instructions in which they are used."

### 7. Jury Verdict

On July 3, 2012 the jury returned a special verdict. On the cause of action for interference with contract, the jury found that Idanta, David Dunn, Steven Dunn, and the

17

Dunn Family Trust knew about the non-competition agreement, paragraph 3.9 of the AML Operating Agreement; they acted with the intent to disrupt the performance of paragraph 3.9; their conduct prevented the performance of paragraph 3.9 or made its performance more expensive or difficult; and their conduct was a substantial factor in causing harm to AML. On the cause of action for aiding and abetting a breach of fiduciary duty, the jury found that Andrews, Runnels, and Franklin knowingly acted against AML's interests, and without AML's informed consent, in forming FPI, and, as to Runnels and Franklin, working for and owning shares in FPI. The jury also found that defendants knew that Andrews, Runnels, and Franklin were going to breach their fiduciary duties to AML; that defendants gave substantial assistance to Andrews, Runnels, and Franklin; and that defendants' conduct was a substantial factor in causing harm to AML.

The jury rejected defendants' affirmative defenses of estoppel, laches, waiver, consent, and ratification. The jury found for defendants, however, on their claim that AML's cause of action for interference with contract was barred by the two-year statute of limitations, finding that defendants proved that AML had suffered harm before March 15, 2005, and that AML had not proven that it did not discover facts leading a reasonable person to suspect defendants' wrongful conduct until after March 15, 2005.

The jury awarded AML restitution (although it was called "damages" on the verdict form) in the amount of $7,075,891. This was the exact figure AML's expert, Melle, had calculated as "the benefits [defendants] received" from the June 2007 sale of their FPI stock, plus interest. The jury also found that AML was not entitled to punitive damages.

8.      Motion for Judgment Notwithstanding the Verdict and New Trial

On August 9, 2012 defendants filed motions for judgment notwithstanding the verdict and for a new trial, arguing that the award of damages was excessive and not supported by substantial evidence. In particular they argued that Melle's testimony was without foundation and that the jury instructions were confusing, as evidenced by the

jury's question regarding the definitions of "harm" and "benefit."[11]  On September 21, 2012 the trial court denied both motions.  The court rejected defendants' contentions of evidentiary and instructional error and found "that the jury's verdict is supported by substantial evidence in the form of testimony and admitted exhibits."  On October 18, 2012 defendants timely filed a notice of appeal.[12]

## DISCUSSION

### A.  *Aiding and Abetting a Breach of Fiduciary Duty*

Defendants challenge the trial court's ruling that a defendant can be liable for aiding and abetting a breach of fiduciary duty, even if the defendant does not owe the plaintiff a fiduciary duty.  Defendants argue that there is no sound policy reason to distinguish between liability for conspiracy to breach a fiduciary duty and liability for aiding and abetting a breach of fiduciary duty by requiring that a conspirator but not an aider and abettor owe a fiduciary duty to the plaintiff.  AML argues that defendants cannot make this argument on appeal, and that, even if they can, on the merits it is legally incorrect.

#### 1.  Standing and Invited Error

AML asserts that defendants lack standing to challenge the trial court's ruling on demurrer because the court sustained their demurrer and therefore they are not aggrieved parties.  AML also asserts that because the trial court gave defendants' jury instruction on aiding and abetting, which did not include a requirement that they owe a fiduciary duty, the doctrine of invited error precludes defendants' claim of error on appeal.

---

[11]  Defendants also submitted a declaration from one of the jurors regarding the confusion, but the trial court properly ruled it inadmissible.  (See Evid. Code, § 1150.)

[12]  The trial court subsequently denied AML's motion for attorneys' fees.  AML's appeal from that order is pending.

19

Only an aggrieved party may appeal. (Code Civ. Proc., § 902; *United Investors Life Ins. Co. v. Waddell & Reed, Inc.* (2005) 125 Cal.App.4th 1300, 1304.) "It is true that, as a general rule, a party is not aggrieved and may not appeal from a judgment or order entered in its favor. [Citation.] However, a party which has not obtained *all* of the relief it requested in the trial court is aggrieved and may appeal. [Citations.]" (*Friends of Aviara v. City of Carlsbad* (2012) 210 Cal.App.4th 1103, 1108; see *Roa v. Lodi Medical Group, Inc.* (1985) 37 Cal.3d 920, 925, fn. 4 [plaintiffs could challenge award of attorneys' fees in their favor on the ground that the statutory limitation on such fees was invalid]; *Archer v. United Rentals, Inc.* (2011) 195 Cal.App.4th 807, 811, fn. 2 [fact that plaintiffs received cash payments did not preclude their appeal of denial of class certification].)

Here, although the trial court sustained defendants' demurrer with leave to amend, the court ruled against defendants on the legal issue of whether AML could maintain a cause of action for aiding and abetting a breach of fiduciary duty in the absence of a fiduciary duty on their part. The trial court sustained the demurrer only because the complaint lacked sufficient factual allegations of aiding and abetting. After amending its complaint AML proceeded and ultimately prevailed on this cause of action. Defendants did not obtain all of the relief they requested and thus were aggrieved by the court's ruling and have standing to challenge it on appeal.

AML also argues that defendants "successfully proposed an aiding and abetting jury instruction, but only one that omitted the independent duty element it claims on appeal should be imposed. Having invited the supposed error, [defendants] forfeited [their] right to appeal the issue." The doctrine of invited error does not apply here.

"Under the doctrine of invited error, when a party by its own conduct induces the commission of error, it may not claim on appeal that the judgment should be reversed because of that error. [Citations.] But the doctrine does not apply when a party, while making the appropriate objections, acquiesces in a judicial determination. [Citation.] As this court has explained: "'An attorney who submits to the authority of an erroneous, adverse ruling after making appropriate objections or motions, does not waive the error in

20

the ruling by proceeding in accordance therewith and endeavoring to make the best of a bad situation for which he was not responsible.''' [Citations.]" (*Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 212-213; see *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403 [invited error does not apply where "a party may be deemed to have induced the commission of error, but did not in fact mislead the trial court in any way—as where a party ""endeavor[s] to make the best of a bad situation for which [it] was not responsible"""'].)

Here, the trial court had already rejected defendants' argument that aiding and abetting a breach of fiduciary duty requires that the aider and abettor owe the plaintiff a fiduciary duty. Defendants did not forfeit the right to challenge that ruling by proposing a jury instruction that was consistent with the trial court's ruling. The doctrine of invited error does not apply where, as here, the party submits a jury instruction pursuant to or consistent with a prior adverse court ruling. (See *Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1052 ["[d]efendants did not invite the error by proposing . . . instructions" on two causes of action "after their unsuccessful attempts to defeat those counts by demurrer and summary adjudication"]; *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555 ["[w]hen an appellant offers instructions on irrelevant matter only after an unsuccessful attempt to remove it from the case, he may attack the relevancy on appeal"]; *Quigley v. Pet, Inc.* (1984) 162 Cal.App.3d 877, 894, fn. 6 [no invited error in submitting instruction on issue where "from the beginning in law and motion, and thereafter through the motion for new trial, defendants objected" to the issue].) Defendants did not forfeit their right to challenge the trial court's ruling on this issue.

### 2. Civil Conspiracy and Aiding and Abetting

Civil conspiracy is "a legal doctrine that imposes liability on persons who, although not actually committing a tort themselves, share with the immediate tortfeasors a common plan or design in its perpetration. [Citation.] By participation in a civil conspiracy, a coconspirator effectively adopts as his or her own the torts of other

21

coconspirators within the ambit of the conspiracy. [Citation.] In this way, a coconspirator incurs tort liability co-equal with the immediate tortfeasors." (*Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, *supra*, 7 Cal.4th at pp. 510-511.) "By its nature, tort liability arising from conspiracy presupposes that the coconspirator is legally capable of committing the tort, i.e., that he or she owes a duty to plaintiff recognized by law and is potentially subject to liability for breach of that duty." (*Id.* at p. 511.) Following *Applied Equipment Corp.*, this court held in *Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571 that "[a] nonfiduciary cannot conspire to breach a duty owed only by a fiduciary." (*Id.* at p. 1597; accord, *Everest Investors 8 v. Whitehall Real Estate Limited Partnership XI* (2002) 100 Cal.App.4th 1102, 1109.)

Some courts, noting the close relationship between conspiracy and aiding and abetting, have suggested that the law should treat conspiracy to breach a fiduciary duty and aiding and abetting a breach of fiduciary duty similarly. For example, in *In re County of Orange* (Bankr. C.D.Cal. 1996) 203 B.R. 983,[13] citing *Applied Equipment Corp.* and *Kidron*, the court stated that it saw "no reason for treating the vicarious tort of aiding and abetting breach of a fiduciary duty differently from that of conspiracy to breach a fiduciary duty. 'Conspiracy is a concept closely allied with aiding and abetting. A conspiracy generally requires agreement plus an overt act causing damage. Aiding and abetting requires no agreement, but simply assistance. The common basis for liability for both conspiracy and aiding and abetting, however, is concerted action.'" (*Id.* at p. 999, quoting *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 78.) In *Howard v. Superior Court* (1992) 2 Cal.App.4th 745 the issue was whether a client attempting to plead a cause of action for aiding and abetting against an attorney had to comply with former Civil Code section 1714.10, which required the plaintiff to obtain a court order before pleading such a civil conspiracy claim. The court noted that "[i]n the abstract, there may be a distinction between an aiding and abetting cause of action and one for

---

[13]    Reversed in part on other grounds in *In re County of Orange* (Bankr. C.D.Cal. 1997) 245 B.R. 138.

22

civil conspiracy," but held that because the alleged conduct fell "within the ambit" of the statute, the statute applied to the plaintiff's aiding and abetting claim. (*Id*. at p. 749, fn. omitted.) And in *K & S Partnership v. Continental Bank, N.A.* (8th Cir. 1991) 952 F.2d 971, the court stated, "[k]nowing participation in a breach of fiduciary duty 'is analogous to a cause of action . . . for aiding and abetting a securities fraud,' where the primary violation involves a breach of fiduciary duty. [Citation.] Likewise, liability for civil conspiracy is in substance the same thing as aiding and abetting liability. Civil conspiracy requires an agreement to participate in an unlawful activity and an overt act that causes injury, so it 'does not set forth an independent cause of action' but rather is 'sustainable only after an underlying tort claim has been established.' [Citations.]" (*Id*. at p. 980.)

California law, however, does not treat conspiracy to breach a fiduciary duty and aiding and abetting a breach of fiduciary duty similarly. In *Casey v. U.S. Bank Nat. Assn.*, *supra*, 127 Cal.App.4th 1138, on which the trial court relied, a trustee in bankruptcy sued three banks, alleging that they aided and abetted the fiduciaries of the bankrupt corporation in a scheme to divert funds from the corporation. One of the causes of action was aiding and abetting a breach of fiduciary duty. (*Id*. at pp. 1141-1142.) Citing this court's opinion in *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 846, the court in *Casey* observed that "California has adopted the common law rule for subjecting a defendant to liability for aiding and abetting a tort. '"Liability may . . . be imposed on one who aids and abets the commission of an intentional tort if the person (a) knows the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other to so act or (b) gives substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person." [Citations.]' [Citation.]" (*Casey*, *supra*, at p. 1144.)[14] The trustee in *Casey* attempted to allege liability under the first theory, and

---

[14]     California courts have consistently followed and applied the two part alternative test for civil aiding and abetting liability in *Saunders* and *Casey*. (See, e.g., *Das v. Bank*

the banks challenged the sufficiency of the allegations of "'substantial assistance.'" (*Id*. at p. 1145.) The court noted "that liability for aiding and abetting depends on proof the defendant had actual knowledge of the specific primary wrong the defendant substantially assisted." (*Ibid*.) The court concluded that the trustee had failed to allege facts showing that the banks knew the fiduciaries were misappropriating corporate funds. Thus, the trustee failed to state a cause of action for aiding and abetting a breach of fiduciary duty. (*Id*. at p. 1153.)

Citing *Casey*, *Saunders*, and the Restatement Second of Torts, the court in *Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.* (2005) 131 Cal.App.4th 802 explained: "Despite some conceptual similarities, civil liability for aiding and abetting the commission of a tort, which has no overlaid requirement of an independent duty, differs fundamentally from liability based on conspiracy to commit a tort. [Citations.] '"[A]iding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct." [¶] . . . [W]hile aiding and abetting may not require a defendant to agree to join the wrongful conduct, it necessarily requires a defendant to reach a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act. . . .' The aider and abetter's conduct need not, as 'separately considered,' constitute a breach of duty. [Citations.]" (*Id*. at p. 823, fn. 10.)

_____

*of America, N.A.* (2010) 186 Cal.App.4th 727, 741, 744-745; *Berryman v. Merit Property Management, Inc.* (2007) 152 Cal.App.4th 1544, 1559; *Austin B. v. Escondido Union School Dist.* (2007) 149 Cal.App.4th 860, 879; *Richard B. LeVine, Inc. v. Higashi* (2005) 131 Cal.App.4th 566, 574; *Fiol v. Doellstedt* (1996) 50 Cal.App.4th 1318, 1325-1326; *River Colony Estates General Partnership v. Bayview Financial Trading Group, Inc.* (S.D.Cal. 2003) 287 F.Supp.2d 1213, 1225; see also *Wood v. Greenberry Financial Services, Inc.* (D.Hawai'i 2012) 907 F.Supp.2d 1165, 1181-1182 [adopting *Casey*]; *El Camino Resources, Ltd. v. Huntington Nat. Bank* (W.D.Mich. 2010) 722 F.Supp.2d 875, 905 [same].)

24

In *Neilson v. Union Bank of California, N.A.* (C.D.Cal. 2003) 290 F.Supp.2d 1101, the court thoroughly reviewed California case law and concluded that under California law a defendant can be liable for aiding and abetting a breach of fiduciary duty in the absence of an independent duty owed to the plaintiff. (*Id.* at p. 1135.) After noting that conspiracy and aiding and abetting "are closely allied forms of liability," the court found that "[n]o California case, however, holds that a party must owe the plaintiff a duty before he or she can be held liable as an aider and abettor. Rather, California cases outlining the elements of aiding and abetting liability have consistently cited the elements of the tort as they are set forth in the Restatement (Second) of Torts, § 876, and have omitted any reference to an independent duty on the part of the aider and abettor. Under this formulation, liability may properly be imposed on one who knows that another's conduct constitutes a breach of duty and substantially assists or encourages the breach." (*Id.* at p. 1133.)

The *Neilson* court explained why this is so: "Unlike a conspirator, an aider and abettor does not 'adopt as his or her own' the tort of the primary violator. Rather, the act of aiding and abetting is distinct from the primary violation; liability attaches because the aider and abettor behaves in a manner that enables the primary violator to commit the underlying tort. . . . Because aiders and abettors do not agree to commit, and are not held liable as joint tortfeasors for committing, the underlying tort, it is not necessary that they owe plaintiff the same duty as the primary violator. Conspirators, by contrast, are held liable for the tort committed by their co-conspirator. [Citation.] Because liability is premised on the commission of a single tort, it is logical that all conspirators must be legally capable of committing the wrong." (*Id.* at pp. 1134-1135, fn. omitted.) "Additionally, causation is an essential element of an aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance that was a substantial factor in causing the harm suffered. [Citations.] . . . This difference too demonstrates the distinction between the forms of liability, and argues in favor of a rule that permits the imposition of aider and abettor liability in the absence of a duty owed directly to the plaintiff." (*Id.* at p. 1135; see *Simi Management Corp. v. Bank of America, N.A.*

25

(N.D.Cal. 2013) 930 F.Supp.2d 1082, 1099, fn. 15 ["'liability for aiding and abetting may exist even where the defendant's conduct does not independently breach a duty to the plaintiff'"]; *Villains, Inc. v. American Economy Ins. Co.* (N.D.Cal. 2012) 870 F.Supp.2d 792, 795 ["'[t]he differences between conspiracy and aiding and abetting are not merely semantic' and . . . '[t]hese differences have led several courts . . . to recognize that a non-fiduciary can aid and abet a breach of fiduciary duty'"]; *Granewich v. Harding* (Or. 1999) 985 P.2d 788, 793-794 ["[l]egal authorities . . . virtually are unanimous in expressing the proposition that one who knowingly aids another in the breach of a fiduciary duty is liable to the one harmed thereby," and "[n]one of those authorities even implies that liability for participants in the breach of fiduciary duty is confined to those who *themselves* owe such duty"]; see also *Heckmann v. Ahmanson* (1985) 168 Cal.App.3d 119, 127 [third party greenmailer purchasers of corporation's shares in takeover attempt can be liable for aiding and abetting breach of fiduciary duty of corporation's directors who authorized corporation's purchase of the third parties' shares at a premium]; accord, *Feinberg Testamentary Trust v. Carter* (S.D.N.Y. 1987) 652 F.Supp. 1066, 1083.)

### 3. Application to This Case

Thus, there are two different theories pursuant to which a person may be liable for aiding and abetting a breach of fiduciary duty. One theory, like conspiracy to breach a fiduciary duty, requires that the aider and abettor owe a fiduciary duty to the victim and requires only that the aider and abettor provide substantial assistance to the person breaching his or her fiduciary duty. (*Casey v. U.S. Bank Nat. Assn*, *supra*, 127 Cal.App.4th at p. 1144; *Coffman v. Kennedy* (1977) 74 Cal.App.3d 28, 32.) On this theory, California law treats aiding and abetting a breach of fiduciary duty and conspiracy to breach a fiduciary duty similarly. Courts impose liability for concerted action that violates the aider and abettor's fiduciary duty. (See *Janken v. GM Hughes Electronics*, *supra*, 46 Cal.App.4th at p. 78; *In re County of Orange*, *supra*, 203 B.R. at p. 999.) The second theory for imposing liability for aiding and abetting a breach of fiduciary duty

26

arises when the aider and abettor commits an independent tort. (See *Casey*, *supra*, at p. 1144; *Saunders v. Superior Court*, *supra*, 27 Cal.App.4th at p. 846.) This occurs when the aider and abettor makes "'a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act.'" (*Berg & Berg Enterprises, LLC v. Sherwood Partners, Inc.*, *supra*, 131 Cal.App.4th at p. 823, fn. 10; accord, *Central Bank v. First Inter. Bank* (1994) 511 U.S. 164, 181.)

AML proceeded on the second theory of aiding and abetting liability. AML pleaded and proved that defendants had actual knowledge of the fiduciary duties Andrews, Runnels, and Franklin owed to AML, that defendants provided the three fiduciaries with substantial assistance in breaching their duties, and that defendants' conduct resulted in unjust enrichment. Thus, the trial court did not err in ruling, on demurrer and in connection with the jury instructions,[15] that defendants could be liable for aiding and abetting a breach of fiduciary duty even though they did not owe a fiduciary duty to AML.

B. *Statute of Limitations for Aiding and Abetting a Breach of Fiduciary Duty*

Defendants also argue that AML's cause of action for aiding and abetting a breach of fiduciary duty was barred by the two-year statute of limitations applicable to a cause of action for interference with contract, and that the trial court erred by not instructing the jury that this two-year limitations period applied to AML's breach of fiduciary duty

---

**15** Pursuant to defendants' special instruction No. 4, the trial court instructed the jury that defendants could be held liable for aiding and abetting a breach of fiduciary duty if: "(1) Runnels, Franklin, and/or Andrews breached their fiduciary duties to [AML]; [¶] (2) Defendants had actual knowledge that Runnels, Franklin, and/or Andrews were breaching their fiduciary duties to [AML]; [¶] (3) Defendants gave substantial assistance or encouragement to Runnels, Franklin, and/or Andrews in breaching their fiduciary duties; [¶] (4) Defendants acted with the intent to participate in the breach of fiduciary duty by Runnels, Franklin, and/or Andrews for the purpose of assisting them in performing the breach of their fiduciary duties; and [¶] (5) That the conduct of Defendants was a substantial factor in causing harm to [AML]."

27

claim.[16] AML argues that the four-year statute of limitations of Code of Civil Procedure section 343, the "catchall provision," applies to its aiding and abetting breach of fiduciary duty claim. We conclude that because the applicable statute of limitations is either three or four years, and there is no dispute that AML filed this action less than three years after accrual,[17] AML's aiding and abetting claim is not barred by the statute of limitations.

The statute of limitations for a cause of action for aiding and abetting a tort generally is the same as the underlying tort. (See *Vaca v. Wachovia Mortgage Corp.* (2011) 198 Cal.App.4th 737, 743-744 & fn. 4 [aiding and abetting fraud]; *River Colony Estates General Partnership v. Bayview Financial Trading Group, Inc.*, *supra*, 287 F.Supp.2d at p. 1220 [aiding and abetting fraud]; see also *Marketxt Holdings Corp. v. Engel & Reiman, P.C.* (S.D.N.Y. 2010) 693 F.Supp.2d 387, 393 ["statute of limitations for each aiding and abetting claim is determined by the underlying tort"].) Thus, the statute of limitations for aiding and abetting a breach of fiduciary duty is the same as the statute of limitations for breach of fiduciary duty. (See *In re Brocade Communications Systems, Inc. Derivative Litigation*, *supra*, 615 F.Supp.2d at pp. 1036-1037 [because aiding and abetting breach of fiduciary duty is "most akin to a breach of fiduciary duty claim," the four-year statute of limitations applies].)

---

**16** Defendants asked the trial court to instruct the jury that the limitations period for both of AML's claims was "two years from the time [AML] knew or should have known of the loss or damage it claims to have suffered." The trial court instructed the jury "[w]ith regard to AML's claim for interference with contract only, Defendants contend that AML's lawsuit was not filed within the time set by law. To succeed on this defense, Defendants must prove that AML's claimed harm occurred before March 15, 2005 unless AML proves that before March 15, 2005 it did not discover, and did not know facts that would have caused a reasonable person to suspect, Defendants' wrongful act or omission."

**17** As noted above, Roberts learned that the Operating Group had granted FPI a license on March 17, 2004. AML filed this action on March 15, 2007. Defendants do not argue that AML's aiding and abetting claim is barred by a three-year statute of limitations.

28

The statute of limitations for breach of fiduciary duty is three years or four years, depending on whether the breach is fraudulent or non-fraudulent.  (See *Fuller v. First Franklin Financial Corp.* (2013) 216 Cal.App.4th 955, 963 ["limitations period is three years . . . for a cause of action for breach of fiduciary duty where the gravamen of the claim is deceit, rather than the catchall four-year limitations period that would otherwise apply"]; *William L. Lyon & Associates, Inc. v. Superior Court* (2012) 204 Cal.App.4th 1294, 1312  ["[b]reach of fiduciary duty not amounting to fraud or constructive fraud is subject to the four-year 'catch-all statute' of Code of Civil Procedure section 343"]; *Thomson v. Canyon* (2011) 198 Cal.App.4th 594, 606-607 [same]; *City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 889 [four-year statute of limitations applies to breach of fiduciary duty, unless the gravamen of the claim is actual or constructive fraud, in which case the statute of limitations is three years].)  Because defendants do not dispute that AML filed this action within three years of accrual, it does not matter whether the breach of fiduciary duty was fraudulent or non-fraudulent.  Either way, the claim is timely.

In some circumstances, the statute of limitations for a breach of fiduciary duty claim can be less than three years.  For example, in *Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.* (2004) 115 Cal.App.4th 1145, the court held that because the claim of breach of fiduciary duty "amount[ed] to a claim of professional negligence," the two-year statute of limitations for professional negligence applied, and the plaintiff could not "prolong the limitations period by invoking a fiduciary theory of liability." (*Id*. at p. 1159.)  Here, defendants argue that the two-year statute of limitations for interference with contract applies because "interference with contract is the gravamen of [AML's] aiding and abetting claim in this case."  Defendants argue that "since a contractual agreement [i.e., the AML Operating Agreement] created the underlying fiduciary obligation (owed by third parties), AML's claim is for interfering with [the three Operating Group members'] obligations to AML, and is logically akin to other interference torts and should be subject to the two-year limitations period of section 339 of the Code of Civil Procedure."

The fiduciary duties of Andrews, Runnels, and Franklin, however, were not created exclusively or even primarily by the Operating Agreement, but were imposed by law on them as members and managers of AML. (See Corp. Code, § 17704.09, subds. (b)(2), (b)(3) [members owe fiduciary duties of loyalty and care to the limited liability company, including the duties to "refrain from dealing with a limited liability company in the conduct or winding up of the activities of a limited liability company as or on behalf of a party having an interest adverse to a limited liability company" and to "refrain from competing with a limited liability company"], subd. (d) ["[a] member shall discharge the duties to a limited liability company and the other members under this title or under the operating agreement and exercise any rights consistent with the obligation of good faith and fair dealing"];[18] *Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 410 ["[t]he duty of loyalty arises not from a contract but from a relationship"]; *Manok v. Fishman* (1973) 31 Cal.App.3d 208, 213 [although "[a]n express agreement between the parties may govern their relationship, . . . to the extent that their respective rights and duties are not spelled out in an express agreement, the law imposes obligations arising out of the nature of their fiduciary relationship"]; see also *Federal Deposit Ins. Corp. v. McSweeny* (S.D.Cal. 1991) 772 F.Supp. 1154, 1157 ["a cause of action for breach of fiduciary duty is its own 'right sued on' and cannot be compartmentalized into another rubric for time-bar purposes"].)

Moreover, AML did not allege that defendants aided and abetted by interfering with a contract. AML's fourth amended complaint mentioned a contractual provision,

---

**18**     Corporations Code sections 17704.07 and 17704.09, effective January 1, 2014, distinguish between a manager-managed limited liability company and a member-managed limited liability company, with the default as member-managed unless the operating agreement provides otherwise. The Operating Agreement for AML named Roberts as the managing member, but provides that the members "may determine that there should be more than one Manager." The January 2000 management agreement gave Andrews, Runnels, and Franklin control over AML's "operational decisions" and responsibility at "both the senior management (operational) level as well as the board-level (leadership) level."

30

paragraph 3.9 of the Operating Agreement, and alleged that it formed the basis for AML's (ultimately unsuccessful) cause of action for interference with contract, but AML did not allege that the Operating Agreement was the basis of the aiding and abetting claim. Instead, the gravamen of AML's cause of action for aiding and abetting breach of fiduciary duty was that defendants provided substantial assistance for Andrews, Runnels, and Franklin in breaching their duties of loyalty as members and managers of AML. AML alleged that defendants acted with Andrews, Runnels, and Franklin "to: a). wrongfully acquire rights to the AML patent for less than full value; b). hire Runnels and Franklin to execute the AML Business Method; and c). otherwise cause Runnels and Franklin to breach their fiduciary duties to AML without seeking or obtaining the requested permission of AML and Roberts, its majority owner and manager." AML alleged that in February 2004 Andrews, Runnels, and Franklin "were secretly aligned with the Defendants and had already commenced negotiating with Defendants," "surreptitiously forwarded [AML's] strategic negotiating points" to defendants, received financial incentives from defendants "to breach their duties of loyalty to AML and its other member," and "incorporate[d] [FPI] for the unlawful purpose of using [FPI] as an operating company to exploit the patented AML Business Method without receiving valid authorization from AML and without adequately compensating AML."[19] AML also alleged that Runnels engaged in a classic example of a breach of the duty of loyalty by signing an unauthorized and undervalued licensing agreement on behalf of both contracting parties, AML and FPI. The fact that one of the breaches of fiduciary duty may also have been a breach of a provision of the Operating Agreement does not mean the three defalcating fiduciaries only breached a provision of the Operating Agreement.

---

[19]    The district court in *Fort Properties, Inc. v. American Master Lease, LLC* (C.D.Cal. 2009) 609 F.Supp.2d 1052 invalidated AML's business patent. The Court of Appeals affirmed the district court's decision invalidating AML's patent in *Fort Properties, Inc. v. American Master Lease LLC* (Fed.Cir. 2012) 671 F.3d 1317.

Thus, the gravamen of AML's aiding and abetting breach of fiduciary duty claim was not interference with a provision of the Operating Agreement. The two-year statute of limitations for interference with contract did not apply.


C.     *Remedies for Aiding and Abetting a Breach of Fiduciary Duty*

Defendants argue that the trial court erred in allowing the jury to make an award based on unjust enrichment, disgorgement, and constructive trust, because equitable remedies available for breach of fiduciary duty are not available for aiding and abetting a breach of fiduciary duty. We agree with AML that the restitutionary remedies of unjust enrichment and disgorgement are available for aiding and abetting breach of fiduciary duty.

"We begin with the law of restitution. An individual is required to make restitution if he or she is unjustly enriched at the expense of another. [Citations.] A person is enriched if the person receives a benefit at another's expense. [Citation.] Benefit means any type of advantage. [Citations.] [¶] The fact that one person benefits another is not, by itself, sufficient to require restitution. The person receiving the benefit is required to make restitution only if the circumstances are such that, as between the two individuals, it is *unjust* for the person to retain it. [Citation.]" (*First Nationwide Savings v. Perry* (1992) 11 Cal.App.4th 1657, 1662-1663; see *City of Chula Vista v. Gutierrez* (2012) 207 Cal.App.4th 681, 686; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 627.)

Disgorgement as a remedy is broader than restitution or restoration of what the plaintiff lost. (*County of San Bernardino v. Walsh* (2007) 158 Cal.App.4th 533, 542; *Feitelberg v. Credit Suisse First Boston, LLC* (2005) 134 Cal.App.4th 997, 1013.) There are two types of disgorgement: restitutionary disgorgement, which focuses on the plaintiff's loss, and nonrestitutionary disgorgement, which focuses on the defendant's

32

unjust enrichment. (*Feitelberg*, *supra*, at p. 1013.)[20] "Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position." (*County of San Bernardino*, *supra*, at p 542.) However, "[m]any instances of 'liability based on unjust enrichment . . . do not involve the restoration of anything the claimant previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained . . . .' [Citation.] '[T]he public policy of this state does not permit one to "take advantage of his own wrong"' regardless of whether the other party suffers actual damage. [Citation.] Where 'a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust . . . the defendant may be under a duty to give to the plaintiff the amount by which [the defendant] has been enriched.' [Citation.]" (*Ibid*; see *Feitelberg v. Credit Suisse First Boston, LLC*, *supra*, 134 Cal.App.4th at p. 1013.)

Moreover, "'"[i]t is not essential that money be paid directly to the recipient by the party seeking restitution. . . ."'" [Citations.] The emphasis is on the wrongdoer's enrichment, not the victim's loss. In particular, a person acting in conscious disregard of the rights of another should be required to disgorge all profit because disgorgement both benefits the injured parties and deters the perpetrator from committing the same unlawful actions again. [Citations.] Disgorgement may include a restitutionary element, but it '"may compel a defendant to surrender all money obtained through an unfair business practice . . . regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice."' [Citation.] Without this result, there

---

**20** The cases cited by defendants that involve restitution under the unfair competition law are inapplicable "[b]ecause restitution in a private action brought under the unfair competition law is measured by what was taken from the plaintiff" (*Clark v. Superior Court* (2010) 50 Cal.4th 605, 614-615), rather than by the defendant's unjust enrichment. (*Ibid*.; *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1149; *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 177-178; *Peterson v. Cellco Partnership* (2008) 164 Cal.App.4th 1583, 1593-1594.)

would be an insufficient deterrent to improper conduct that is more profitable than lawful conduct." (*County of San Bernardino v. Walsh*, *supra*, 158 Cal.App.4th at pp. 542-543.)

Disgorgement based on unjust enrichment is an appropriate remedy for aiding and abetting a breach of fiduciary duty. For example, in *County of San Bernardino v. Walsh*, *supra*, 158 Cal.App.4th 533, the defendant, the vice president of a waste management company, was negotiating a new contract with the county. He and the former county administrative officer (CAO) agreed to bribe the current CAO to award the contract to the waste management company, along with an additional consulting agreement that would benefit the former CAO and the defendant. (*Id.* at pp. 538-539.) When the county discovered the bribery scheme, the county sued the current CAO, the former CAO, and the defendant. Affirming the trial court's decision finding them liable for breaching or inducing a breach of the current CAO's fiduciary duty, fraud, unfair competition, and unjust enrichment, the Court of Appeal held: "Disgorgement of profits is particularly applicable in cases dealing with breach of a fiduciary duty, and is a logical extension of the principle that public officials and other fiduciaries cannot profit by a breach of their duty. Where a person profits from transactions conducted by him as a fiduciary, the proper measure of damages is full disgorgement of any secret profit made by the fiduciary regardless of whether the principal suffers any damage. [Citations.]" (*Id.* at p. 543.) Even though the defendant was not in a fiduciary relationship with the county, the court held that his "[a]ctive participa[tion] in the breach of fiduciary duty by another [rendered him] accountable for all advantages [he] gained thereby . . . ." (*Ibid*; see *Chicago Park Dist. v. Kenroy, Inc.* (Ill. 1980) 402 N.E.2d 181, 186 ["[i]t is a fundamental rule in the law of restitution that '[a] third person who has colluded with a fiduciary in committing a breach of duty, and who obtained a benefit therefrom, is under a duty of restitution to the beneficiary'"]; Rest.3d Restitution, § 43, com. g ["[b]enefits derived from a fiduciary's breach of duty may . . . be recovered from third parties, not themselves under any special duty to the claimant, who acquire such benefits with notice of the breach," and "[*a*] *fortiori*, one who actively participates in another's breach of fiduciary duty will be liable to disgorge the profits realized thereby"].)

34

Defendants assert that "nonrestitutionary disgorgement is purely equitable and only for the court to decide." Defendants do not argue, however, that the trial court erred by submitting the issue of unjust enrichment to the jury. Indeed, as the court in *Jogani v. Superior Court* (2008) 165 Cal.App.4th 901 explained, "'[t]he fact that equitable principles are applied in the action does not necessarily identify the resultant relief as equitable. [Citations.] Equitable principles are a guide to courts of law as well as of equity. [Citations.]' [Citations.]" (*Id*. at p. 909.) Where liability is definite and damages may be calculated without an accounting, the action is legal. (*Id*. at pp. 909-910; see *Lectrodryer v. SeoulBank* (2000) 77 Cal.App.4th 723, 728 [plaintiff entitled to jury trial on claim for unjust enrichment seeking restitution of money unjustly retained by bank, "even when equitable principles are applied"]; *Martin v. County of Los Angeles* (1996) 51 Cal.App.4th 688, 694 ["'law courts now recognize and apply many equitable principles and grant relief based thereon where . . . legal relief is sought in the form of a judgment for a specific amount'"]; see also *Holson Inv. Co. v. Villelli* (N.D.Ill. 1998) 1998 WL 312107 at p. 5 ["the amount of the restitution is a question of fact for the jury"].)

As part of their argument that restitution is not available for aiding and abetting a breach of fiduciary duty, defendants contend that the trial court erred by instructing the jury on constructive trust. The court gave a special instruction, requested by AML and entitled "disgorgement/constructive trust," that defined a constructive trust, set forth the requirements for imposing a constructive trust, and told the jurors that if they found the existence of the elements of a constructive trust then they could award AML the profit defendants derived from their investment in FPI.[21] This hybrid instruction essentially

---

[21] The trial court instructed the jury pursuant to Special Instruction No. 2: "A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. A constructive trust may only be imposed where the following three conditions are satisfied: (1) the existence of property or a property interest; (2) the right of the Plaintiff to that property or property interest; and (3) some wrongful acquisition or detention of that property or property interest by Defendants.

35

asked the jury to determine whether AML had proven entitlement to a constructive trust, but did not ask the jury to actually impose one; it only asked the jury to award disgorgement. Nevertheless, to the extent that the instruction asked the jury to decide whether to impose a constructive trust, the instruction was erroneous.

"A constructive trust is an involuntary equitable trust created by operation of law as a remedy to compel the transfer of property from the person wrongfully holding it to the rightful owner. [Citations.] The essence of the theory of constructive trust is to prevent unjust enrichment and to prevent a person from taking advantage of his or her own wrongdoing. [Citation.]" (*Communist Party v. 522 Valencia, Inc.* (1995) 35 Cal.App.4th 980, 990.) Imposition of "[a] constructive trust is an equitable remedy to compel the transfer of property by one who is not justly entitled to it to one who is. [Citation.]" (*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga* (2009) 175 Cal.App.4th 1306, 1332; accord, *Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 457.) It is not "a substantive claim for relief." (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 398; see *Embarcadero Mun. Improvement Dist. v. County of Santa Barbara* (2001) 88 Cal.App.4th 781, 793 ["[a] constructive trust is not a substantive device but merely a remedy"].) The issue of whether to impose a constructive trust is an equitable issue for the court. (See *Fowler v. Fowler* (1964) 227 Cal.App.2d 741, 747 ["it is for the trial

---

"If you find that (1) a property interest existed in the proceeds of any sale by Defendants of their interests in FORT and/or the interest on any loans made by Idanta Partners, Ltd. To FORT; (2) Plaintiff had a right to the proceeds of any sale by Defendants of their interests in FORT and/or the interest on any loans made by Idanta Partners, Ltd. To FORT; and (3) Defendants wrongfully acquired the proceeds of any sale by Defendants of their interest in FORT and/or the interest on any loans made by Idanta Partners, Ltd. to FORT, then you may award Plaintiff the profit that Defendants have derived from their acquisition of the proceeds of any sale by Defendants of their interests in FORT and/or the interest on any loans made by Idanta Partners, Ltd. to FORT. However, if you find that Plaintiff never had a right to the proceeds of any sale by Defendants of their interest in FORT and/or the interest on any loans made by Idanta Partners, Ltd. to FORT, then you should not award Plaintiff any damages under the theory of constructive trust or disgorgement."

court to decide whether" the plaintiff has proven entitlement to a constructive trust].) The trial court erred by submitting the issue of whether to impose a constructive trust to the jury.

The error, however, was not prejudicial. "'A judgment may not be reversed for instructional error in a civil case "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." [Citation.]' [Citation.] Instructional error in a civil case is prejudicial '"where it seems probable"' that the error '"prejudicially affected the verdict."' [Citation.] '[W]hen deciding whether an [instructional] error . . . was prejudicial, the court must also evaluate (1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' [Citation.]" (*Turman v. Turning Point of Central California, Inc.* (2010) 191 Cal.App.4th 53, 61; *Daum v. SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1313-1314.) The appellant has the burden on appeal of showing that an instructional error was prejudicial and resulted in a miscarriage of justice. (*Boeken v. Philips Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1678; *Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1161.)

Defendants' statement, without more, that the instruction on constructive trust was "plainly prejudicial to [them], given the Jury's monetary verdict," is insufficient to meet their burden of showing prejudice. (See *Scheenstra v. California Dairies, Inc.* (2013) 213 Cal.App.4th 370, 403.) "Prejudice from an erroneous instruction is never presumed; it must be affirmatively demonstrated by the appellant. [Citations.]" (*Wilkinson v. Bay Shore Lumber Co.* (1986) 182 Cal.App.3d 594, 599; see *Brokopp v. Ford Motor Co.* (1977) 71 Cal.App.3d 841, 853-854.) Defendants have not demonstrated that the measure or award of restitution would have been any different had the instruction focused on disgorgement only, without any mention of constructive trust. Defendants have not shown how a more favorable verdict would have been reasonably probable had the instruction excluded the theory of constructive trust. Therefore, any error was not prejudicial.

37

D.    *Award of Restitution*

Defendants first contend that one who aids and abets a breach of fiduciary duty may be liable for the fiduciary's unjust enrichment, but cannot be liable for more than the fiduciary's unjust enrichment. Thus, defendants contend that even if they can be liable for aiding and abetting the breach of fiduciary duty by Andrews, Runnels, and Franklin, they cannot be liable for more than any profit Andrews, Runnels, and Franklin obtained. Defendants, however, cite no authority for this contention. Moreover, the Restatement distinguishes between those who are subject to disgorgement because they have breached a fiduciary duty and those who are subject to disgorgement because they are other "conscious wrongdoer[s]," such as aiders and abettors: "The object of restitution . . . is to eliminate profit" of the "conscious wrongdoer, *or* . . . defaulting fiduciary without regard to notice or fault . . . ." (Rest.3d Restitution & Unjust Enrichment, § 51(4).) Indeed, "[t]he object of the disgorgement remedy—to eliminate the possibility of profit from conscious wrongdoing—is one of the cornerstones of the law of restitution and unjust enrichment," and "[t]he profit for which the wrongdoer is liable by the rule of §51(4) is the net increase in the assets of the wrongdoer, to the extent that this increase is attributable to the underlying wrong." (*Id.*, com. e.)[22] As independent wrongdoers under the second theory of aiding and abetting liability based on the commission of an independent tort (see *Casey v. U.S. Bank Nat. Assn.*, *supra*, 127 Cal.App.4th at p. 1144; *Saunders v. Superior Court*, *supra*, 27 Cal.App.4th at p. 846.), defendants were subject to disgorgement of the profit or "net increase in the assets" they obtained, not merely those that Andrews, Runnels, and Franklin obtained.

---

[22]    In *Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, the court relied on section 51(4) of the Restatement Third of Restitution and Unjust Enrichment, although then still in draft form, and "deem[ed it] applicable under California law to a trustee who has committed a breach of trust . . . ." (*Id.* at p. 894; see *Ghirardo v. Antonioli* (1996) 14 Cal.4th 39, 51 [relying on the Restatement of Restitution definition of unjust enrichment].)

38

Defendants next contend that even if AML is entitled to an award based on unjust enrichment or disgorgement, the jury instructions were erroneous and the amount of restitution in the verdict is inconsistent with controlling law and not supported by substantial evidence. We agree that the trial court committed prejudicial instructional error. Therefore, the award must be reversed.

As noted above, subsection (4) of section 51 of the Restatement Third of Restitution and Unjust Enrichment provides that "the unjust enrichment of a conscious wrongdoer, or of a defaulting fiduciary without regard to notice or fault, is the net profit attributable to the underlying wrong . . . . Restitution remedies that pursue this object are often called 'disgorgement' or 'accounting.'" The amount of restitution to be made is sometimes described as the "benefit" received by the defendant. (Rest., Restitution, § 1, com. a.) This was the term the trial court used in Special Instruction No. 3.

Subsection (5) of section 51 of the Restatement Third of Restitution and Unjust Enrichment explains that "[i]n determining net profit the court may apply such tests of causation and remoteness, may make such apportionments, may recognize such credits or deductions, and may assign such evidentiary burdens, as reason and fairness dictate, consistent with the object of restitution as specified in subsection (4). . . ." The Restatement further explains that "[p]rofit includes any form of use value, proceeds, or consequential gains [citation] that is identifiable and measurable and not unduly remote." (*Id.*, subsec. (5)(a).) In addition, a "conscious wrongdoer or a defaulting fiduciary may be allowed a credit for money expended in acquiring or preserving the property or in carrying on the business that is the source of the profit subject to disgorgement. . . ." (*Id.*, subsec. (5)(c).) Comment a explains that "[t]he principal focus of § 51 is on cases in which unjust enrichment is measured by the defendant's profits, where the object of restitution is to strip the defendant of wrongful gain [citations]. . . ." (*Id.*, com. a.)

In measuring the amount of the defendant's unjust enrichment, the plaintiff may present evidence of the total or gross amount of the benefit, or a reasonable approximation thereof, and then the defendant may present evidence of costs, expenses, and other deductions to show the actual or net benefit the defendant received. As the

39

court in *Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th 866 stated, "[t]he party seeking disgorgement 'has the burden of producing evidence permitting at least a reasonable approximation of the amount of the wrongful gain,'" and the "'[r]esidual risk of uncertainty in calculating net profit is assigned to the wrongdoer.' [Citation.]" (*Id.* at p. 894.) The court in *Uzyel* adopted this formulation from the Restatement, which explains that the "traditional formula, inherited from trust accounting and enshrined in the Copyright Act (17 U.S.C. § 504(b)), states that the claimant has the burden of proving revenues and the defendant has the burden of proving deductions." (Rest.3d Restitution & Unjust Enrichment, § 51, com. i.) The new Restatement, however, "adopts a more modern and generally useful rule that the claimant has the burden of producing evidence from which the court may make at least a reasonable approximation of the defendant's unjust enrichment," and "the defendant is then free (there is no need to speak of 'burden shifting') to introduce evidence tending to show that the true extent of unjust enrichment is something less." (*Ibid.*) Thus, "[a]s a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement. Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid." (*Id.*, com. h.) Of particular relevance here, comment h of the Restatement Third of Restitution and Unjust Enrichment, section 51, states: "Disloyal fiduciaries are uniformly reimbursed for the purchase price of property acquired in conscious breach of their duty of loyalty."

The trial court instructed the jury pursuant to Special Instruction No. 7, entitled "Calculation of Disgorgement of Defendants' Benefits—Effective Date": "If you decide to award [AML] any profit made or to be made by Defendants as a result of [FPI's] existence, you must consider the value of those benefits at the time they were acquired by Defendants. You may not reduce the value of those benefits by any events occurring after they were first acquired, including any later decision by Defendants to accept less for the benefits they received than their value on the date they received them." The trial court further instructed the jury pursuant to Special Instruction No. 4, entitled

40

"Calculation of Disgorgement of Defendants' Benefits—No Offset": "In awarding [AML] any profit made or to be made by Defendants as a result of [FPI's] existence, you must disregard what Defendants might have earned had they not created [FPI]. Instead, you must only focus on the profit received or to be received by Defendants as a result of their actual conduct in this case."

These special jury instructions, requested by AML, were erroneous. Special Instruction No. 7 incorrectly told the jury that it had to consider the value of the benefits defendants received at the time of acquisition of the benefits. Defendants acquired shares of FPI stock for $2.3 million in April 2004, which "at the time" probably, although not necessarily, had a value of $2.3 million (because that is what defendants paid for the stock). Assuming that defendants had not negotiated a discount, or that defendants had not otherwise underpaid or overpaid, there was no benefit yet to defendants because they had only exchanged $2.3 million in cash for $2.3 million in stock. Defendants held the stock, which in June 2007 may have had a value of $5.8 million, giving defendants a potential benefit of $3.5 million. Sometime later, defendants' FPI stock had a value of at least $3.3 million ($2.9 million plus $300,000 plus $100,000), and perhaps more, depending on the value of defendants' contractual right to the second $2.9 million, discounted by the prospects of FPI's finances, risk of insolvency, and ability to pay the balance due. Both sides were entitled to present evidence, including expert testimony, on these issues. The trial court's instruction to consider only the value of the benefits "at the time they were acquired" improperly instructed the jury on valuing the defendants' enrichment.[23]

---

[23] AML argues in its supplemental brief that Special Instruction No. 7 stood "simply [for] the proposition that any purchase price of the property to be disgorged should be 'considered' in the profit equation, *i.e.*, if proven, it can be deducted as an expense from the highest future value to determine [defendants'] profit." This is not a fair reading of the instruction. In the instruction's mandate to the jurors that they "must consider the value of those benefits at the time they were acquired by Defendants," "those benefits" referred to the jury's "award" of defendants' profits, not an element of a "profit equation." There is nothing in the instruction suggesting that the jury should deduct the

41

Special Instruction No. 7 also incorrectly told the jury that it could not reduce the value of the benefits defendant received "by any events occurring after they were first acquired, including any later decision by Defendants to accept less for the benefits they received than their value on the date they received them." As noted above, an unjust enrichment defendant may introduce evidence that its enrichment was reduced by costs, expenses, and other factors. Defendants may have received only a total of $400,000 out of the second $2.9 million payment because (as AML argued) defendants engaged in a sham transaction to minimize the value of AML's claims in this litigation,[24] or because (as defendants argued) of "the failure of the real estate market . . . in September of 2009." Either way, defendants were entitled to present evidence of this transaction, AML was entitled to challenge the transaction's legitimacy, and the jury was entitled to hear this evidence and determine the value of defendants' remaining interest in FPI. As counsel for defendants acknowledged to the trial court, if counsel for AML "want to argue that they should get $5.8 million even though the defendants never got $5.8 million, I suppose they can argue that." Counsel for defendants just wanted the corresponding ability to argue that defendants did not get $5.8 million. Special Instruction No. 7 deprived them of this ability by erroneously precluding the jury from considering defendants' acceptance of $400,000 for its right to receive the remaining $2.9 million when determining the unjust enrichment defendants obtained as a result of the sale of their FPI stock.[25]

---

purchase price or anything else. Moreover, AML's argument is inconsistent with its argument, also in its supplemental brief, that defendants' $2.3 million purchase price "is irrelevant to the restitutionary calculation" and should *not* be deducted as an expense or offset when calculating defendants' profit.

[24]     Defendants' agreement to accept $100,000 for the remaining $2.6 million occurred within 30 days of Melle's deposition, where defendants first saw Melle's damages analysis.

[25]     AML argues that defendants forfeited their challenge to Special Instruction No. 7 by withdrawing their objection to the instruction. AML directs us to a portion of the record where counsel for defendants withdrew an objection to the use of the word

42

Special Instruction No. 4 compounded the problem by instructing the jury that it "must only focus on the profit received or to be received by Defendants . . . ." There is no difference between the benefit or "profit" defendants received and the benefit or "profit" defendants were to receive in the future. Defendants received one benefit, an equity interest in FPI. There may have been a dispute about how to value this benefit, but both sides were entitled to present evidence of its value, and the jury was entitled to determine how much it was really worth. The 2004 value of $2.3 million and the 2007 values of $3.5 million and $400,000 were evidence of the value of the unjust enrichment defendants obtained as a result of their wrongful conduct, but none of these values was conclusive, and the jury was entitled to "focus" on any or all of them.[26]

In support of Special Instruction No. 7, AML cited section 51 of the Restatement Third of Restitution and Unjust Enrichment, section 202 of the Restatement Second of Restitution, and *Elliott v. Elliott* (1964) 231 Cal.App.2d 205. None of these authorities

"benefits" in the instruction. We do not construe this stipulation to one word in the instruction as a waiver of all objections to the instruction.

[26] AML argues in its supplemental brief that "[n]othing in the text of any instruction prevented the jury from determining [defendants'] wrongful profits net of any legitimate costs" because there was no evidence in the record that defendants actually paid $2.3 million for the FPI stock. It is true that none of the parties to the 2004 transaction testified that defendants paid $2.3 million. But there was testimony by Melle about the $2.3 million investment. There was a long discussion at sidebar, while Melle was on the witness stand, about whether the trial court would allow counsel for defendants to ask Melle about the $2.3 million. Melle had included the $2.3 million in his expert report, but, in response to a tentative ruling by the court on a jury instruction regarding "offsets," Melle removed the $2.3 million from his calculations. Counsel for defendants argued to the court that it was unfair to allow the jury to make an award "without having discounted for the [$]2.3 [million] that [defendants] put in," and that "the [$]2.3 [million] offset definitely comes in now. That's an expenditure." The trial court ultimately allowed counsel for defendants to ask Melle about the $2.3 million investment. Counsel for defendants then asked Melle if he had "take[n] into account the fact that defendants had put in 2,300,000 dollars as their initial investment," and Melle acknowledged he had not. Melle said that his calculations did "not include a deduction for the amount that the defendants initially invested . . . ." Both sides agree that Melle's testimony was the only testimony on this issue.

43

supports an instruction that AML was entitled to recover the full contract price of defendants' stock rather than the amount defendants actually received for the stock, or that in determining the value of defendants' profits from the sale of its FPI stock the jury should not consider defendants' subsequent decision to accept less than the contract amount. As noted above, section 51 focuses on the defendant's net benefit. Section 202 concerns imposition of a constructive trust, not restitution based on unjust enrichment. And the court in *Elliott* held that in valuing an asset subject to a constructive trust, the trier of fact should consider the actual value of the asset, including issues such as collectability and solvency. (See *Elliott*, *supra,* at p. 213 [failure to make findings on whether the note was collectable and whether the maker of the note was insolvent was reversible error].)

Finally, these instructional errors were prejudicial. As noted, the "uniform test for civil instructional error" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 581, fn. 11) is whether "it is reasonably probable the error affected the verdict." (*Ted Jacob Engineering Group, Inc. v. The Ratcliff Architects* (2010) 187 Cal.App.4th 945, 962). In assessing the likelihood that instructional error prejudicially affected the verdict, "'[t]the reviewing court should consider not only the nature of the error . . . but [also] the likelihood of actual prejudice as reflected in the individual trial record, taking into account "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." [Citation.]'" (*Viner v. Sweet* (2004) 117 Cal.App.4th 1218, 1226, fn. 8, quoting *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983, and *Soule v. General Motors Corp.*, *supra*, at pp. 580-581.) Here, the evidence was that defendants obtained a net benefit from the sale of their FPI stock of approximately $1 million ($600,000 from the first $2.9 million payment, plus $400,000), not the $5.8 million the jury awarded. Moreover, as noted above, the other jury instructions on restitution simply made matters worse. And although counsel for AML asked the jury to award Franklin's estimated value of AML's interest in a potential joint venture with defendants, $26,462,188, the joint venture never materialized and the jury's award was not close to this amount.

44

Finally, the jury gave a very clear and unequivocal indication it was misled or at least confused by asking a question during deliberations about the meaning of "harm" and "benefit" and how to calculate defendants' unjust enrichment. The instructional error was prejudicial because in all probability it "misled the jury and affected [the] verdict." (*Krouse v. Graham* (1977) 19 Cal.3d 59, 72; see Code Civ. Proc., § 475; *Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 32 ["instructional error will be prejudicial if it is '*reasonably probable* that instructions . . . *actually* misled the jury'"], quoting *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682.) Therefore, we conclude that defendants are entitled to a new trial on the amount of unjust enrichment they should pay in restitution to AML.

On remand, the trial court should instruct the jury that the amount by which defendants were unjustly enriched "is the net profit attributable to the underlying wrong." (Rest.3d Restitution & Unjust Enrichment, § 51(4).) In calculating the net profit attributable to the underlying wrong, the jury will need guidance on how to evaluate three important numbers in this case: (1) the $2.3 million defendants paid for the FPI stock in April 2004, (2) the value of the FPI stock defendants received when they purchased the stock in April 2004, and (3) the value of defendants' right to receive the second $2.9 million payment when they sold the stock in June 2007. On the first issue, the trial court should instruct the jury that it should give defendants "credit for money expended in acquiring or preserving the property or in carrying on the business that is the source of the profit subject to disgorgement." (Rest.3d Restitution & Unjust Enrichment, § 51(5)(c); accord, *Uzyel v. Kadisha*, *supra*, 188 Cal.App.4th at p. 894; see *Carrey v. Boyes Hot Springs Resort, Inc.* (1966) 245 Cal.App.2d 618, 622 ["in calculating the net profit of a business all of the costs of producing the gross income should be deducted"].)[27]

---

[27]     Citing *Ward v. Taggart* (1959) 51 Cal.2d 736, 744, AML argues in its supplemental brief that defendants are not entitled to a credit for their $2.3 million investment because "expenses that aided the wrongdoer in accomplishing the wrongdoing cannot be deducted" and "[a]mounts expended to further breaches of fiduciary duty are

45

On the second issue, the trial court should instruct the jury it should consider the face value of the benefits at the time defendants received them (i.e., the $2.3 million defendants paid for the FPI stock), as well as evidence that the benefits were worth more or less than what defendants paid for them. (See *Knudsen v. Hill* (1964) 227 Cal.App.2d 639, 640, 642 [in a damages case involving conversion of a "pledged promissory note," measure of damage is "value at time of conversion and, although the rule is variously expressed, *face* value of the bill or note is, prima facie, its *true* value," although "[e]vidence is admissible to establish that actual value is a lesser sum than face value"]; *St. Paul Fire & Marine Ins. Co. v. Compaq Computer Corp.* (8th Cir. 2008) 539 F.3d 809, 818 ["[w]hile the contract price is evidence of the value of an item, it is not conclusive"].)

On the third issue, the trial court should instruct the jury that in determining whether defendants have met their burden of proving any deductions or discount from the right to receive the second $2.9 million, the jury may consider defendants' ability to collect the full contract price for the sale of their stock and FPI's solvency (*Elliott v. Elliott*, *supra*, 231 Cal.App.2d at p. 213; cf. *Medi-Cen Corp. v. Birschbach* (1998) 123 Md.App. 765, 778-779 [720 A.2d 966, 972-973] [discussing the effect of doubtful collectability on the value of a converted asset], or even evidence that defendants intentionally chose not to collect the full amount due for the sale of their FPI stock in order to minimize their liability in this litigation. (See *Elliott*, *supra*, at p. 212;

_____

not valid deductions from [defendants'] profits." This argument confuses the price of a wrongfully acquired asset with the costs associated with its acquisition. "One who misappropriates the property of another is not entitled to deduct any of the costs of the transactions by which he accomplished his wrongful conduct." (*A & M Records, Inc. v. Heilman* (1977) 75 Cal.App.3d 554, 570.) The purchase price of the misappropriated property, however, is not a transactional cost. (See Rest.3d Restitution & Unjust Enrichment, § 51.) Indeed, in *Ward* the Supreme Court held that the defendant was not entitled to a deduction for commissions and other transaction costs, but the defendant did receive a credit for the $4,000 per acre purchase price of the property he misappropriated and resold for $5,000 per acre, so that the plaintiff recovered a judgment "representing the $1,000 per acre secret profit." (*Ward*, *supra*, at pp. 739-740, 742, 744.)

46

*Janiszewski v. Behrmann* (1956) 345 Mich. 8, 29 [75 N.W.2d 77, 93] [court will not "permit the tortious taker to escape by paying only the give-away price at which he sold, regardless of fair value"].)

Finally, the trial court should instruct the jury, consistent with the Restatement, that "'[w]here a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value . . . .' (Rest., Restitution, § 151, p. 598.)" (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 698-699;[28] see *Gerstle v. Gamble-Skogmo, Inc.* (E.D.N.Y. 1969) 298 F.Supp. 66, 100-101 ["the restitutional basis of recovery is the value of the property at the time the sale was consummated or a higher value at a subsequent time if the value of the property has thereafter fluctuated"].) Such an instruction will assist the jury in deciding how to value the second $2.9 million payment, which defendants essentially claim decreased to $400,000. "Where the subject matter is of fluctuating value, and where the person deprived of it might have secured a higher amount for it had he not been so deprived, justice to him may require that the measure of recovery be more than the value at the time of deprivation. *This is true where the recipient knowingly deprived the owner of his property or where a fiduciary in violation of his duty used the property of the beneficiary for his own benefit.* In such cases the person deprived is entitled to be put in

---

**28**    *Colgan v. Leatherman Tool Group, Inc.* involved claims under the false advertising law, Business and Professions Code section 17500, and the unfair competition law, Business and Professions Code section 17200. (*Colgan v. Leatherman Tool Group, Inc.*, *supra*, 135 Cal.App.4th at p. 672.) As noted, nonrestitutionary disgorgement is not available for these claims. (*Id.* at pp. 696-697; see footnote 20 *ante*.) The issue of how to value an asset that fluctuates in value or that trades in a limited market, however, arises whether the plaintiff is seeking restitutionary disgorgement based on what the plaintiff lost or nonrestitutionary disgorgement based on what the defendant gained.

substantially the position in which he would have been had there not been the deprivation, and this may result in granting to him an amount equal to the highest value reached by the subject matter within a reasonable time after the tortious conduct." (*Hutt v. Dean Witter Reynolds, Inc.* (D.Mass. 1990) 737 F.Supp. 128, 134; see *Roxas v. Marcos* (1998) 89 Hawai'i 91, 152 [969 P.2d 1209, 1270] [amount of damages for conversion of gold "is the highest value of the gold between—and including—the date of conversion and a reasonable time thereafter"]; *American General Ins. Co. v. Equitable General Corp.* (E.D.Va. 1980) 493 F.Supp. 721, 765 [for purposes of rescission, court valued stock "at the highest value attained within a reasonable time" after announcement of merger].)

## DISPOSITION

The judgment is reversed as to the amount of defendants' unjust enrichment. In all other respects, it is affirmed. The order denying defendants' motions for judgment notwithstanding the verdict and new trial is reversed to the extent it denies a new trial on the issue of the amount of defendants' unjust enrichment, and in all other respects it is affirmed. The trial court is directed to grant a new trial on the issue of the amount of defendants' unjust enrichment only. The parties are to bear their own costs on appeal.

SEGAL, J.[*]

We concur:

PERLUSS, P. J.                    ZELON, J.

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.